Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | |
| LT. GEN SCOTT A. SPELLMON, et al., | 4:21-cv-00047-BMM |
| Defendants, | **Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motions for Summary Judgment** |
| AMERICAN GAS ASSOCIATION, et al., | |
| Defendant-Intervenor, | |
| STATE OF MONTANA, | |
| Defendant-Intervenor. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ...........................................................................1

ARGUMENT ...............................................................................1

I.    Plaintiffs have standing to bring their ESA claims .........................................1

      A.    Plaintiffs' have established standing for their
            procedural injury claims .........................................................1

      B.    Plaintiffs have also established organizational standing......................9

II.   The Corps' "no effect" determination for NWP 12 is
      unlawful and not entitled to deference ............................................12

      A.    The ESA regulations require programmatic consultation
            on NWP 12 .....................................................................12

      B.    NWP 12 certainly "may affect" listed species ...................................21

      C.    The Corps' "no effect" determination is not
            entitled to any deference .....................................................23

      D.    The Corps has unlawfully delegated its ESA duties
            to permittees .................................................................29

III.  The NWP 12 environmental assessment violates NEPA .............................32

      A.    The EA fails to evaluate "frac-outs" ...................................32

B.  The EA fails to evaluate forested wetlands clearing ........................... 35

C.  The EA fails to evaluate cumulative effects ........................................ 37

D.  The EA fails to fully analyze foreseeable impacts
of oil and gas pipelines ......................................................................... 40

IV.  NWP 12 violates Section 404(e) of the CWA ................................................. 50

A.  The Corps' "separate and distant" justification
is unsupported by the record. .............................................................. 51

B.  NWP 12's post-issuance procedures do not ensure
that a project will have minimal effects .............................................. 55

V.  Defendants' arguments regarding remedy are both
premature and flawed ...................................................................................... 59

CONCLUSION ............................................................................................................ 64

# TABLE OF AUTHORITIES

## Cases

*350 Montana v. Haaland*,
    29 F.4th 1158 (9th Cir. 2022) ........................................................................47

*Alliance for the Wild Rockies v. United States Forest Service*,
    907 F.3d 1105 (9th Cir. 2018) ........................................................................59

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
    988 F.2d 146 (D.C. Cir. 1993) ........................................................................60

*Am. Anti-Vivisection Soc'y v. USDA*,
    946 F.3d 615 (D.C. Cir. 2019) ........................................................................10

*California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
    767 F.3d 781 (9th Cir 2014) ............................................................................2

*Center for Biological Diversity v. U.S. Department of the Interior*,
    563 F.3d (D.C. Cir. 2009) ..............................................................................16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    481 F. Supp. 2d 1059 (N.D. Cal. 2007) .........................................................18

*Citizens for Better Forestry v. U.S. Department of Agriculture*,
    341 F.3d 961 (9th Cir. 2003) ...........................................................................7

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .........................................................................................5

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Engineers*,
    417 F. Supp. 3d 1354 (W.D. Wash. 2019) ....................................... 39, 54, 58

*Columbia Riverkeeper v. United States Army Corp of Engineers*,
   No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020) ..........48

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ................................................................. 16, 19

*Ctr. for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020) .................................................................. 25, 47

*Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*,
   941 F.3d 1288 (11th Cir. 2019) ....................................................................43

*Cty. of Los Angeles v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999)....................................................................58

*Defenders of Wildlife v. Gutierrez*,
   532 F.3d 913 (D.C. Cir. 2008)........................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)................................................................... 13, 32, 44

*Department of Transportation v. Public Citizen*,
   541 U.S. 752 (2004)......................................................................................41

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
   887 F.3d 906 (9th Cir. 2018) ........................................................................24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)........................................................................................5

*Fund for Animals v. Kempthorne*,
   538 F.3d 124 (2d Cir. 2008) .........................................................................30

*Grand Canyon Trust v. Fed. Aviation Admin.,*
  290 F.3d 339 (D.C. Cir. 2002)......................................................................44

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)...................................................................................9

*Karuk Tribe of Cal. v. United States Forest Serv.,*
  681 F.3d 1006 (9th Cir. 2012) ............................................................. 10, 44

*Kisor v Wilkie,*
  139 S. Ct. 2400 (2019)................................................................................53

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
  387 F.3d 989 (9th Cir. 2004) .......................................................................36

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) .....................................................................33

*Lane Cty. Audobon Soc. v. Jamison,*
  958 F.2d 290 (9th Cir. 1992) .......................................................................18

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)....................................................................................2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)...................................................................... 35, 52, 55, 58

*Nat'l Ass'n of Home Builders v Defenders of Wildlife,*
  551 U.S. 664 (2007)............................................................................ 22, 25

*Nat'l Family Farm Coal. v. EPA,*
  960 F.3d 1120 (9th Cir. 2020) .....................................................................60

*Nat'l Family Farm Coalition v. United States EPA*,
    966 F.3d 893 (9th Cir. 2020) .......................................................... 3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ..........................................................28

*Native Ecosystems Council v. Marten,*
    No. CV 18-87-M-DLC, 2020 WL 1479059 (D. Mont. Mar. 26, 2020)........59

*Natural Resources Defense Council v. U.S. Dep't of the Navy*,
    No. CV-01-07781 CAS (RZX), 2002 WL 32095131
    (C.D. Cal. Sept. 17, 2002) .............................................................16

*Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers,*
    454 F. Supp 3d 985 (D. Mont., Apr. 15, 2020) ............................................17

*NRDC v. Jewell,*
    749 F.3d 776 (9th Cir., 2014) ..........................................................30

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ..........................................................44

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1988).........................................................................2

*Ohio Valley Environmental Coalition v. Bulen,*
    429 F.3d 493 (4th Cir. 2005) ..........................................................57

*Ohio Valley Env't Coal. v. Hurst,*
    604 F. Supp. 2d 860 (S.D.W. Va. 2009) ........................................58

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007) ....................................20

*Pollinator Stewardship Council v. U.S. E.P.A.*,
806 F.3d 520 (9th Cir. 2015) .........................................................................60

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)........................................................................ 37, 49

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) ....................................................................3, 6

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .......................................................................43

*Sawtooth Mountain Ranch LLC v. United States,*
No. 1:19-CV-00118-CWD, 2022 WL ...........................................................24

*Selkirk Conservation All. v. Forsgren*,
336 F.3d 944 (9th Cir. 2003) .........................................................................43

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)............................................................. 41, 47

*Sierra Club v. Sigler*,
695 F.2d 957 (5th Cir 1983) .........................................................................44

*Sierra Club, Inc. v. Bostick*,
787 F.3d (10th Cir. 2015) ...................................................................... passim

*Sierra Club, Inc. v. Bostick*,
No. CIV-12-742-R, 2013 WL 6858685
(W.D. Okla. Dec. 30, 2013)................................................................... passim

*Smith v. Pac. Properties & Dev. Corp.*,
358 F.3d 1097 (9th Cir. 2004) .........................................................................9

*Soc. Sec. Admin. v. Fed. Labor Rels. Auth.*,
   201 F.3d 465 (D.C. Cir. 2000)......................................................................25

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*,
   985 F.3d 1032 (D.C. Cir. 2021)...................................................................44

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)......................................................................................20

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ............................................................... passim

*Wetlands Action Network v. U.S. Army Corps of Engineers*,
   222 F.3d 1105 (9th Cir. 2000) .....................................................................43

*Whaley v. Schweiker*,
   663 F.2d 871 (9th Cir. 1981) .......................................................................25

*White Tanks Concerned Citizens, Inc. v. Strock*,
   563 F.3d 1033 (9th Cir. 2009) .....................................................................43

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
   457 F. Supp. 3d 880 (D. Mont. 2020) ..........................................................36

*WildEarth Guardians v. United States. Dep't of Agric.*,
   795 F.3d 1148 (9th Cir. 2015) .......................................................................2

*Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Engineers*,
   351 F. Supp. 2d 1232 (D. Wyo. 2005) ..........................................................46

## Statutes

16 U.S.C. § 1532 .........................................................................................25

33 U.S.C. § 403 ...........................................................................................33

33 U.S.C. §1344 ................................................................................... 42, 50

5 U.S.C. § 706 .............................................................................................59

## Regulations

33 C.F.R. § 320.4 .................................................................. 42, 45, 49

33 C.F.R. § 325 App. B ...............................................................................43

33 C.F.R. § 330.1 ........................................................................................56

33 C.F.R. § 330.2 ........................................................................................51

40 C.F.R. 230 ..............................................................................................45

50 C.F.R. § 402.01 ......................................................................................25

50 C.F.R. § 402.02 ............................................................................ 12, 14, 20

50 C.F.R. § 402.14 ............................................................................... passim

81 Fed. Reg. 35198 (June 1, 2016) ...........................................................34

82 Fed. Reg. 1860 (Jan 6, 2017) ...............................................................46

82 Fed. Reg. 1885 (Jan 6, 2017) ...............................................................51

87 Fed. Reg. 17,281 (Mar. 28, 2022) ................................................. 49, 62

87 Fed. Reg. 23,453 (April 20, 2022) ........................................................47

# INTRODUCTION

As Plaintiffs demonstrated in their opening brief, the Corps violated the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Clean Water Act ("CWA") when it reissued NWP 12 without adequately evaluating its significant environmental impacts on waterways and listed species or the cumulative effects of NWP 12-authorized pipelines on the environment. Defendants have offered no convincing response to Plaintiffs' arguments that the Corps' reissuance of NWP 12 violated bedrock environmental laws. Accordingly, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motions.

# ARGUMENT

## I.   Plaintiffs have standing to bring their ESA claims

### A.   Plaintiffs' have established standing for their procedural injury claims.

Plaintiffs have provided sufficient factual support to establish standing to bring their ESA claims. The Corps has instituted a permit program that impacts listed species and their critical habitats and yet failed to consult with the expert wildlife agencies as the ESA requires. Plaintiffs are conservation organizations, and their members have a cognizable interest in protecting myriad listed species affected by the NWP 12 program. The Corps' failure to consult with the Services on NWP 12 undermines the substantive protections of the ESA, which directly

1

harms the interests of the Plaintiff organizations and their members in observing, studying, and protecting such species. Plaintiffs have therefore met the applicable standing requirement.

Importantly, where, as here, Plaintiffs contend that an agency has violated procedural obligations under the ESA, Plaintiffs can establish injury-in-fact by showing that the violation "could impair a separate concrete interest of theirs," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 (1992)—such as a concrete interest in wildlife observation. *Id*. at 562-63. As the Ninth Circuit has held, where a plaintiff alleges that an agency has failed to follow a required procedure that would further plaintiff's interests, the standing inquiry focuses on whether the injury is "fairly traceable to the challenged conduct." *WildEarth Guardians v. United States. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015); *see also California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 (9th Cir 2014) (a plaintiff need only establish that the agency "violated procedural rules designed to protect their concrete interests, and that the challenged action will threaten those interests").

Consistent with these rulings, the Supreme Court has declared that individuals who are injured by a failure to comply with a required procedure "*may complain of that failure at the time the failure takes place*, for the claim can never get riper." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1988) (emphasis

added). That reasoning has been expressly adopted by the Ninth Circuit in holding

that where an agency has failed to comply with ESA Section 7 when making a

programmatic decision that threatens the interests of the plaintiffs, such a dispute is

"ripe for adjudication" when the programmatic decision is made. *See W.*

*Watersheds Project v. Kraayenbrink ("Kraayenbrink")*, 632 F.3d 472, 486 (9th

Cir. 2011).

Indeed, the Ninth Circuit recently reaffirmed that there are specific "rules of

Article III standing that apply to procedural injuries in determining Petitioners'

standing...." *Nat'l Family Farm Coal. v. United States EPA*, 966 F.3d 893, 909

(9th Cir. 2020) (citation omitted). There, the Court held that "[i]n the context of

procedural violations, the injury-in-fact requirement is met if 'the procedures in

question are designed to protect some threatened concrete interest of [the

petitioner] that is the ultimate basis of his standing.'" *Id.* (quoting *Salmon*

*Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008)).

Plaintiffs have shown through several declarations, which Defendants

ignore,[1] that the Corps' failure to consult with the Services on NWP 12 undermines

the substantive protections of the ESA, which directly harms the interests of the

---

[1] Although Defendants attempt to misdirect the Court's attention by focusing
only on the standing declaration of Mr. Krum, Gov. Br. 32; Coal. Br. 15, Plaintiffs
are not relying on Mr. Krum's declaration for standing with regards to their ESA
claims.

Plaintiff organizations and their members in preventing harms to myriad endangered and threatened species. *See, e.g.,* First Hamel Decl. ¶11-14 (detailing impacts to protected sturgeon from NWP 12 activities through sedimentation and oil spills, and explaining how these impacts harm his academic and aesthetic interests); First Hartl Decl. ¶27-29 (discussing impacts to listed species from NWP 12 through habitat loss and contamination from oil spills, which harms his academic, recreational, conservational, and aesthetic interests); Midkiff Decl. ¶6, 11-12 (discussing impacts to protected birds from NWP 12 and how the lack of programmatic consultation harms his "professional, aesthetic, and recreational interests in the preservation of the Missouri River system and the habitat it provides, including for listed species"); Estrin Decl. ¶11-12 (describing firsthand observation of the impacts to critical wildlife habitat from NWP 12 activities).

Plaintiffs also provided declarations explaining the organizations' members' interests in listed species that are implicated by NWP 12, including from members that study and work to protect these species. *See* First Hartl Decl. ¶11, 13 ("Activities that harm native species or their habitat also harm our staff and members' interests, values, and quality of life."); Estrin Decl. ¶13, 17 ("Many of Waterkeeper's and U.S. Waterkeeper Groups' respective individual members live and recreate in areas that have been subject to NWP 12-authorized pipeline construction, and have suffered direct injury as a result of the above-described

environmental impacts," including through impacts to listed species); Templeton
Decl. ℙ10-12 (describing harm to protected species from NWP 12 projects—
including through oil spills and sediment—which harms the interests of the
organization's members in protecting such species).

Plaintiffs' declarations therefore show a direct link between the failure to
engage in Section 7 consultation and their concrete interests, and hence a
"substantial risk that [] harm will occur" from the Corps' unlawful conduct.
*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013). In fact, the
Corps itself has *admitted* that NWP 12 "may affect" listed species. *See*
NWP001046 (conceding that thousands of NWP-authorized activities "may affect"
listed species). And it estimates that NWP 12 will be used close to *50,000* times,
NWP001052, affecting wetlands and other habitats that imperiled species rely on
across the country. Therefore, the harm from NWP 12 is certainly "likely, as
opposed to merely speculative." *See* Coalition Brief ("Coal. Br.") 16 (quoting
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181
(2000)).[2] And these allegations provide more than a "general interest in protecting

---

[2] Defendant-Intervenor's argument that Plaintiffs cannot establish standing
because the Corps' actions "only authorize[] activities that have 'no effect' on
listed species," Coal. Br. 17-18, is premised on the same erroneous legal argument
that this Court previously rejected, and thus provides no basis for challenging
Plaintiffs' standing to bring their ESA claims. In any case, in resolving standing,
the Court must presume that plaintiffs will prevail on the merits of their claim.
*See Defenders of Wildlife v. Gutierrez,* 532 F.3d 913, 924 (D.C. Cir. 2008).

the environment." Federal Defendants' Brief ("Gov. Br.") 33. Rather, they establish concrete and particularized harm to Plaintiffs' interests in protecting listed species from the impacts of NWP 12. This is sufficient to provide standing, particularly for the procedural ESA violation at issue.

Despite Defendants' attempt to avoid it, *Nat'l Family Farm Coalition* is squarely on point. There, the Court found that the conservation organization had standing because one of its members submitted a declaration stating that the pesticide at issue was approved for use in the state where she lives, and that she "enjoys observing endangered species where she lives." *Nat'l Family Farm Coal.,* 966 F.3d at 911. The court found that plaintiffs had shown "an aesthetic and recreational interest that is geographically linked to the individual asserting the claim, thereby satisfying the injury-in-fact requirement," because the "the ESA's consultation procedures" are specifically "designed to protect these concrete interests." *Id.* (citing *Salmon Spawning*, 545 F.3d at 1229). The same applies here. Plaintiffs have submitted declarations asserting their members' scientific, aesthetic, and recreational interest in protecting listed species that are harmed by NWP 12 activities across the country, which the Corps failed to address through consultation on the NWP 12 program. The Corps' failure to consult undoubtedly undermines the specific interests of the Plaintiff organizations and their members.

Therefore, Plaintiffs' initial declarations provided sufficient specificity to establish standing to challenge the Corps' procedural ESA violation, and Defendants' contention that Plaintiffs must do more to identify specific NWP 12 projects is misguided. *See* Gov. Br. 32; Coal. Br. 15. That is especially true here because there is no publicly available information on how and where NWP 12 has been used since it was reauthorized.[3] The Corps does not publish a list of NWP 12 projects, nor is there any public notice when the Corps receives or approves pre-construction notifications ("PCNs"). By design, NWP 12 shields projects from public scrutiny; thus, Defendants' contention that Plaintiffs are required to identify specific projects to establish standing is not only off-base but highlights the way in which Plaintiffs' interests are threatened in the absence of consultation. *See Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 977 (9th Cir. 2003) (In a procedural injury case the "imminence or lack thereof of site-specific action is simply a factual coincidence, rather than a basis for legal distinction").

Although the declarations submitted by Plaintiffs with their Opening Brief are sufficient to establish standing, Plaintiffs are buttressing their showing with the attached Second Declaration of Mr. Hartl, which provides an example of a recent

---

[3] Plaintiffs have sought this information pursuant to the Freedom of Information Act, but the Corps has largely failed to respond after nearly a year. *See* Hayes Decl., ¶ 6-15.

NWP 12-authorized project that required formal consultation because it was deemed likely to adversely affect two listed bat species.[4] 2nd Hartl. Decl. ¶ 5. Plaintiff Center for Biological Diversity has long worked to protect these species, and this project illustrates how the failure to engage in consultation on NWP 12 adversely affects the concrete interests of the Plaintiff conservation organizations. *Id*. at ¶¶7, 11.

Plaintiffs are also submitting the Second Declaration of Dr. Hamel, which identifies a pipeline in South Carolina that has applied to the Corps for authorization to use NWP 12, and which poses a risk to designated critical habitat for endangered Atlantic sturgeon in the Great Pee Dee River. 2nd Hamel Decl. ¶¶4-6. Any contamination of the Great Pee Dee River or harm to Atlantic sturgeon from that project would adversely affect his concrete interests in studying and protecting imperiled sturgeon, and the Corps' failure to undertake consultation on NWP 12 exacerbates the harm to his interests. *Id*. at ¶¶7-9. As such, Plaintiffs have provided more than sufficient facts to establish standing for their ESA claim.

---

[4] The fact that formal consultation was undertaken for that project does not undermine the need for programmatic review of NWP 12, since the *aggregate* effects of NWP 12 on species cannot be evaluated in the context of a specific project.

**B.      Plaintiffs have also established organizational standing**

In addition to suing on behalf of its members, an organization may establish injury-in-fact if it can demonstrate an agency action results in: (1) frustration of its organizational mission; or (2) diversion of its resources to combat the allegedly unlawful conduct. *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Here, Plaintiffs have adequately asserted *both* kinds of organizational injuries (referred to as *Havens* standing), either of which is sufficient.

Plaintiffs have established that protecting listed species is at the heart of their organizational missions. *See, e.g.,* First Hartl Decl. ¶3-6 ("The Center is a nonprofit... dedicated to the protection of endangered species and wild places."); *see also* Templeton Decl. ¶5; Estrin Decl. ¶9. Plaintiffs have also established that the Corps' failure to consult on NWP 12 frustrates that organizational mission because it deprives the organizations of essential information bearing on impacts to listed species and undermines the substantive protections of the ESA that the Plaintiff organizations rely on to protect their interests. *See, e.g.,* First Hartl Decl. ¶10, 14 (Discussing how the Corps' failure to engage in programmatic consultation on NWP 12 to establish best management practices and mechanisms for tracking the aggregate impacts of the NWP 12 program harms the interests of Plaintiffs).

Plaintiffs have therefore established organizational standing based on the subversion of the substantive protections that consultation would afford species, the deprivation of crucial information bearing on species' impacts that would result from consultation, and the harm to the organizations' interests from the Corps' failure to comply with Section 7. *See Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2019) (providing standing where the agency's failure impaired the "organizational interests by depriving it of key information that it relies on to fulfill its mission") (citation omitted); *see also Karuk Tribe of Cal. v. United States Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc) (observing that compliance with ESA's procedural requirements is critical to effectuating the Act's substantive protections).

Plaintiffs have further satisfied Circuit precedent for *Havens* standing by establishing that the Corps' complete failure to consult on NWP 12 has harmed the Plaintiff organizations by requiring them to divert their limited resources to fill the gap left by the agency. As Plaintiffs set forth in their declarations, the Corps' actions have required Plaintiffs to "divert resources from other critical tasks that would not have been necessary absent the Corps' actions here, which has impaired our fundamental mission to protect the environment and imperiled species." First Hartl Decl. ¶ 16; *see also* Complaint at ¶¶ 37, 38.

10

Plaintiffs further explained that the Corps' actions required Plaintiffs to "divert and expend resources and staff—which would have instead been expended on other organizational conservation priorities—to learn about the effects of NWP 12 on the environment and listed species," including through Freedom of Information Act requests and "examining NWP 12 projects in an effort to ascertain the effects of NWP 12-authorized projects on specific waterways, habitats, and species in which Plaintiffs and their members have vital interests." Complaint, ECF No. 1 at ¶37; *see also* First Hartl Decl. ¶16, 17. The Corps' actions thereby "required the expenditure of personnel and resources even to learn about and monitor the adverse impacts on species associated with" the Corps' failure to comply with the ESA, directly undermining Plaintiffs' "ongoing efforts to enforce environmental laws that protect listed species and the habitats they rely on." First Hartl Decl. ¶16; *see also* Templeton Decl. ¶7 (stating that Plaintiff Friends of the Earth has "spent considerable resources" investigating the harm caused by NWP 12-authorized pipelines).

Therefore, in addition to standing for the procedural injury, this case *also* presents a classic example of *Havens* standing. Plaintiffs have consequently met their burden to establish standing for their ESA claims.

## II. The Corps' "no effect" determination for NWP 12 is unlawful and not entitled to deference

Defendants make several arguments defending the Corps' "no effect" determination for NWP 12, but they all boil down to the same erroneous legal position that this Court has already rejected: that the Corps fulfills its ESA obligations through project-specific consultations, and therefore the reissuance of NWP does not affect species and review at the programmatic level is not required. However, it remains clear that the Corps must consult on the NWP 12 program itself, since it is undoubtedly an "agency action" that "may affect" listed species as those terms are defined in the ESA. The Corps' repackaged arguments are impossible to harmonize with the Court's prior ruling and the analysis underlying it, and thus summary judgement should be granted in favor of Plaintiffs.

### A. The ESA regulations require programmatic consultation on NWP 12

As set forth in Plaintiffs' Opening Brief, the ESA regulations require consultation for any "program" or "permit" that may affect listed species, 50 C.F.R. § 402.02.[5] Not only is it readily apparent that the NWP 12 program—which

---

[5] Defendant-Intervenor's suggestion that programmatic consultation is "optional," Coal. Br. 24, confuses the clear requirement in the ESA regulations for consultation on "programs," 50 C.F.R. § 402.02, with instances where agencies voluntarily consult on activities that are not part of a specific program, but may benefit from programmatic review to streamline consultation for individual actions.

itself constitutes a permit authorizing thousands of activities—"may affect" such species, but the Services have confirmed that the ESA "still requires a programmatic consultation" even if projects developed under that program are subject to site-specific consultations. NWP019877. The regulations therefore require consultation on the NWP 12 program "as a whole." 50 C.F.R. § 402.14(c)(4).

Federal Defendants attempt to rewrite history by claiming that "the Corps is not relying on subsequent, activity specific consultations to ensure compliance with ESA Section 7." Gov. Br. 46. But that is precisely the basis on which the Corps relied to avoid consultation when reissuing NWP 12. *See* NWP003596 ("[T]he issuance or reissuance of NWPs does not require ESA section 7 consultation because no activities authorized by any NWPs 'may affect' listed species or designated critical habitat without first completing activity specific ESA Section 7 consultations.") Federal Defendants' impermissible *post hoc* rationalization must be disregarded. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (*Post-hoc* rationalizations are not properly before the court).

Regardless, Federal Defendants' *post hoc* attempt to reframe the Corps' position—stating that NWP 12 has "no effect" because it does not allow "immediate effects to listed species or critical habitat," Gov. Br. 48—is

13

unconvincing. NWP 12 does indeed have "immediate effects" without the need for any further agency review whenever permittees unilaterally decide that they need not submit a PCN. *See infra* at 38. In any event, the "may affect" trigger does not require "immediate effects"—particularly for programmatic review, which is intended to *precede* project-specific consultations for actions taken under the program—and thus Defendants' position is clearly inconsistent with the governing regulations. *See* 50 C.F.R. § 402.02 (defining "effects of the action" to include effects that are caused by the action—here the reissuance of NWP 12—but occur "*later in time*") (emphasis added). Likewise, Defendants-Intervenors mistakenly argue that NWP 12 has "no effect" because it is "highly conditioned and restricted in scope," Coal. Br. 19; however, the restrictions referred to (i.e., General Condition 18) only support project-specific review, which is legally insufficient to meet the Corps' duty to consider the NWP 12 program "as a whole." 50 C.F.R. § 402.14(c)(4). Defendants' circuitous logic cannot justify the Corps' attempt to avoid its clear ESA duties through a blatant misconstruction of the ESA regulations.

Indeed, although the plain language of 50 C.F.R. § 402.02 requires the Corps to consult on "programs," Defendants' position would render that requirement meaningless. Under the Corps' approach, there would *never* be a need for consultation on programmatic actions that "may affect" listed species because the

required project-specific reviews for actions taken under the program would negate the need for consultation on the program itself. Therefore, project-specific review cannot logically be used as an excuse to avoid consultation on the program as a whole, particularly where, as here, the action at issue is not only a program but is also a *permit* that private parties may immediately invoke so long as they contend that the permit conditions have been compiled with. And whether NWP 12 is labelled a program, a permit, and/or a rule, it is certainly an "agency action" subject to the Section 7 consultation requirement. *See id*. In fact, Federal Defendants readily concede that "NWP 12 is an agency action within the meaning of the ESA," Gov. Br. 43; therefore, since it "may affect" listed species, the Corps must comply with the ESA when reissuing it.

Plaintiffs are in no way suggesting that the regulations require *all* agency programs, "regardless of whether they may affect listed species," to undergo consultation. Gov. Br. 47. Rather, Plaintiffs' position has always been that the ESA regulations clearly require consultation for programmatic actions that "may affect" listed species. And here there is resounding record evidence that NWP 12 easily surpasses the "may affect" threshold for Section 7 consultation. *See infra,* Section II(B)*.* Therefore, contrary to Defendants' arguments, Coal. Br. 24, the Corps' "no effect" determination cannot act to automatically preclude consultation where that determination is clearly arbitrary and capricious. *See Kraayenbrink,* 632 F.3d at

15

496 (holding BLM's "no effect" conclusion was arbitrary and capricious and, therefore, the "resulting failure to consult [was] arbitrary and capricious in violation of the BLM's obligations under the ESA").

The cases Defendant-Intervenor's rely on to suggest that programmatic review is unnecessary where project-specific consultation will occur are inapposite. Coal. Br. 22-23. *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), was premised on the fact that in the context of that oil lease sale, it was not even certain that any listed species would be in the areas where the projects would take place, *id.* at 483, whereas here the Corps has already acknowledged that listed species will be affected by NWP 12 activities. *See* Plaintiffs' Opening Brief ("Pls. Br.") 15-17. Moreover, the government's position is contrary to this Circuit's settled precedent in *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988) (requiring consultation on a lease program itself, explaining the ESA requires an agency "to analyze the effect of the entire agency action" and rejecting Services' deferral of comprehensive impacts analysis to project-specific stage).[6]

---

[6] *Natural Resources Defense Council v. U.S. Dep't of the Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131 (C.D. Cal. Sept. 17, 2002), is similarly irrelevant. Coal. Br. 22-23. There, the court suggested that the Navy had discretion to determine whether programmatic consultation was necessary, *id.* at *79; however, that case predates the Services' 2015 and 2019 regulations defining and explaining the requirements for programmatic consultation, which clarified that programmatic consultation *is required* for such programs. *See* NWP019877 (The

As the Services—and this Court—have determined, the regulations require programmatic review of NWP 12 because it is necessary to consider the aggregate impacts of the permit program and to guide implementation by establishing criteria to avoid, minimize, or offset adverse effects on listed species and critical habitat. *See* 50 C.F.R. §§ 402.02, 402.14(i)(6); *Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers,* 454 F. Supp 3d 985, 992 (D. Mont., Apr. 15, 2020) ("Programmatic review of NWP 12 in its entirety . . . provides the only way to avoid piecemeal destruction of species and habitat.").[7] And there is ample Circuit precedent to support Plaintiffs' position. *See id.* at 992-93 (discussing Ninth Circuit caselaw establishing that an agency may not avoid consultation on programmatic actions by relying on future, project-specific consultations).

Defendant-Intervenor's attempt to distinguish this Circuit precedent is misplaced. *See* Coal. Br. 26-34. Although these decisions did not involve "no effect" determinations, that has no bearing on their relevance here. These cases

---

ESA "still requires a programmatic consultation" even if specific projects "are subject to site-specific . . . consultations").

[7] Plaintiffs' position is not that the Corps should have "evaluated all NWP 12 activities that could be authorized at some point in the future." Coal. Br. 21. Rather, as the Services have made clear, programmatic review allows the Services to consider up-front the likely overall impacts of the NWP 12 program and ensure that appropriate mechanisms are in place for tracking, avoiding, minimizing, and mitigating impacts—particularly aggregate impacts from multiple projects across the country—to avoid jeopardy. *See* NWP024829.

establish that an agency may not avoid its ESA Section 7 duties for programmatic actions by relying on future, project-specific consultations. That is true whether the agency unlawfully invokes those later consultations to support a "no effect" determination, or to limit the scope of informal or formal consultation. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1095 (N.D. Cal. 2007) (stating the court was unable to find *any* Ninth Circuit caselaw affirming a "no effect" determination where the agency relied on project-specific consultation to support that determination for a programmatic action) (citing *Pac. Rivers Council*, 30 F.3d at 1050).

Indeed, contrary to Defendant-Intervenor's mischaracterization, Coal. Br. 34, the Court's decision in *Lane County* is squarely on point. In that case, the Bureau of Land Management established criteria for selecting millions of acres of land for logging. *Lane Cty. Audobon Soc. v. Jamison*, 958 F.2d 290, 291 (9th Cir. 1992). The Court held that the strategy "may affect" listed species, and thus that the agency's failure to consult "before" the strategy could "be implemented through the adoption of individual sale programs" violated the ESA, despite the agency's consultation with FWS on individual timber sales. *Id.* at 294. Much like the logging strategy in *Lane County*, NWP 12 establishes criteria for activities that "may affect" listed species because it specifically allows and regulates activities that result in the loss and degradation of habitat. Accordingly, as in *Lane County*,

the Corps must consult before the NWP 12 program is implemented through project-specific approvals. Relying on project-specific review would result in an illegal piecemeal analysis of those impacts.

*Conner* is also instructive. There, the Bureau of Land Management and FWS argued that they need not address impacts to listed species from oil and gas exploration at the lease-sale stage in part because each lease required consultation before moving forward. *Conner*, 848 F.2d at 1452. The Court disagreed, holding that agencies could not defer the wholesale analysis of impacts to the project-specific stage. *Id.* at 1453-58. The Court reasoned that "the ESA on its face requires the [agency] . . . to consider all phases of the agency action," and refused to "carve out a judicial exception to ESA's clear mandate that a comprehensive biological opinion . . . be completed before initiation of the agency action." *Id*. at 1453, 1455. Like the lease stipulations requiring project-specific consultation in *Conner*, here General Condition 18 will not ensure against jeopardy from NWP 12's aggregate impacts at the national level, which can only be accomplished through programmatic review.

Precedent, including this Court's own prior analysis, thus establishes the need for programmatic consultation on NWP 12. Defendants nonetheless insist that project-specific reviews are an adequate substitute for programmatic consultation because they incorporate a "cumulative effects" analysis. Gov. Br. 49; Coal. Br.

34. But even when project-specific consultations do occur, the cumulative effects analysis is narrowly limited to the "action area" for a particular project and so does not and cannot consider the aggregate effects of NWP 12, which covers waters and wetlands throughout the country. *See* 50 C.F.R. § 402.02 (defining cumulative effects as "those effects . . . that are reasonably certain to occur within the action area"); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F. Supp. 2d 1248, 1266-67 (W.D. Wash. 2007) (explaining that, for programmatic actions, deferring consultation "improperly curtails the discussion of cumulative effects" for the program as a whole). Indeed, the Services' have explained that programmatic consultation "allows for a broad-scale examination" of federal programs that is "not as readily conducted" through subsequent project-specific consultation. NWP024829.

Therefore, the Court should—once again—hold that the ESA regulations require consultation on NWP 12—which is both a "program" and a "permit" within the plain terms of the regulations—and that the Corps has failed to comply with its clear ESA duties. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) ("One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7" of the ESA.").

## B.    NWP 12 certainly "may affect" listed species

Federal Defendants acknowledge that "NWP 12 is certainly an agency action that, in some instances, authorizes ground disturbing activit[ies]," and concedes that "these activities may adversely affect the environment, in particular, wetlands." Gov. Br. 43. But Defendants make the unfounded claim that NWP 12 does not meet the ESA's low "may affect" threshold, simply because not *all* of this harm would necessarily occur in habitat for listed species. *Id.* at 43-44. This is a non sequitur. Indeed, the Corps' own "Biological Assessment" states that "wetlands are an important habitat for listed species," NWP003582, and the agency acknowledges that thousands of NWP-12 authorized activities must undergo consultation precisely because they "may affect" listed species. NWP001046.

It therefore defies credulity for the Corps to maintain that a permit program that will be used close to *50,000* times over 5-years, impacting more than 3,000 acres of jurisdictional waters, NWP001052—including waterway and wetland habitats that listed species are known to rely on—will have "no effect" on listed species. Indeed, as in the prior litigation there continues to be resounding record evidence that the Corps' issuance of NWP 12 "may affect" listed species and their habitat. *See* Pls. Br. 15-18.

Moreover, the Services have left no doubt that NWP 12 meets the low threshold for Section 7 consultation, including by using the NWP program as a

*prime example* of where programmatic consultation is required, NWP024828, and

through prior consultations with NMFS that set forth exactly how NWP 12

activities adversely affect listed species. *See* Pls. Br. 17. As FWS stated in its

comment letter on the proposed 2021 NWPs, the program "will directly and

indirectly impair recovery of listed species and may threaten additional imperiled

species such that their listing may be warranted." NWP009604.

Federal Defendants take issue with Plaintiffs' reliance on the statements

from previous consultations with NMFS. Gov. Br. 44-45. But the opinion of the

expert wildlife agency—that NWP 12 not only "may affect" but is likely to

adversely affect and even jeopardize listed species absent adequate protective

measures at the national level, NWP011044—confirms that the Corps'

determination that NWP 12 has "no effect" whatsoever on listed species is

factually and legally groundless.

Furthermore, while an agency may be entitled to "change [its] mind," Gov.

Br. 44, so long as it can proffer adequate legal and factual support for doing so, *see*

*Kraayenbrink*, 632 F.3d at 481, that principle has nothing to do with this case.[8]

---

[8] Federal Defenders' reliance on *Home Builders* is therefore misplaced. Gov. Br. 45 (citing *Nat'l Ass'n of Home Builders v Defenders of Wildlife*, 551 U.S. 664, 658-59 (2007)). Plaintiffs are not relying on any change in the Corps' position during the course of reissuing NWP 12. Rather, Plaintiffs are arguing that reissuance of NWP 12, which is unquestionably a final agency action, is patently unlawful given the prior findings of the expert wildlife agencies that undermine the Corps' current position regarding whether NWP 12 "may affect" listed species.

Indeed, Federal Defendants can point to no changes to the 2021 version of NWP 12 that would support a different outcome than the Court reached in its prior ruling, and, critically, Defendants provide nothing that would indicate the expert wildlife agencies have ever changed their minds about the need for consultation on the NWPs. *See*, *e.g.,* NWP019877 (Services' 2019 rulemaking reiterating that programmatic consultation was appropriate for the NWPs, because the ESA "still requires a programmatic consultation" even if specific projects are subject to site-specific consultations). This is yet another diversionary attempt by the Corps to avoid its clear ESA duties.

### C.    The Corps' "no effect" determination is not entitled to any deference

As set forth above, the Corps' sole rationale for avoiding programmatic consultation is that the issuance of NWP 12 has no effect on listed species because any impacts to such species will be addressed through project-specific consultation. *See* Gov. Br. 38. As discussed, this is contrary to the governing regulations, which explicitly require consultation on "programs" and "permits" even where individual actions taken pursuant to a program *may* undergo project-

---

*Home Builders* in no way precludes the court from looking to the Services' prior reviews of NWP 12 to determine whether the Corps' "no effect" determination was arbitrary and capricious, especially since there is no evidence that the Services have abandoned those positions.

specific review. *See* NWP019877. The Corps' flawed reading of the *Services'* regulations is not entitled to deference.

Federal Defendants place undue reliance on *National Family*. *See* Gov. Br. 37. In that case, the court deferred to the EPA's "no effect" determination because it was premised on scientific analysis within the agency's expertise. *Nat'l Fam. Farm Coal.,* 966 F.3d at 923. As the court noted, the EPA acted as a "factfinder," and analyzed the potential for harm to listed species from a pesticide using "risk quotients" calculated by estimating the amount of exposure to the pesticide. *Id*. EPA determined whether the pesticide would affect listed species by analyzing specific science regarding toxicity and exposure, therefore the court deferred to agency's expert scientific analysis because it provided factual support for the "no effect" determination. *Id.* at 923-4.[9]

That is a far cry from what occurred here, where the Corps made no factfinding based on its expertise, but rather premised its "no effect" determination on an erroneous legal interpretation of the ESA and its implementing regulations.

---

[9] The same is true of the other cases Federal Defendants rely on, where the agencies were given deference based on the application of scientific expertise. *See, e.g., Sawtooth Mountain Ranch LLC v. United States,* No. 1:19-CV-00118-CWD, 2022 WL (Forest Service's "no effect" determination reached by considering "water quality, habitat access, habitat elements, channel conditions and dynamics, flow/hydrology, and watershed conditions"); *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,* 887 F.3d 906, 915, 925–26 (9th Cir. 2018) (Corps' "no effect" determination based on analysis of actual discharges of copper, which showed concentrations below EPA-promulgated standards).

Indeed, unlike in *National Family*, the Corps has *admitted* that NWP 12 "may affect" listed species. *See* Pls. Br. 15-16. Thus, there is no factual underpinning for the Corps' "no effect" determination, which is instead premised on a misguided legal theory that this Court already rejected. Since the Corps' "no effect" determination was not based on any agency expertise, the agency is not entitled to any deference. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 733 (9th Cir. 2020) (declining to defer to agency on matters outside its area of expertise); *see also National Family*, 966 F.3d at 914 (noting the court's review "must still be 'searching and careful, subjecting the agency's decision to close judicial scrutiny'") (citation omitted).

Indeed, it is the Services—not the Corps—that Congress entrusted to administer the ESA. *See* 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b); *Nat'l Ass'n of Home Builders*, 551 U.S. at 672 (deferring to FWS and NMFS as "the two agencies primarily charged with administering § 7(a)(2) and the drafters of the regulations implementing that section"). Federal Defendants' contention that the Corps is entitled to deference regarding its erroneous interpretation of the *Services'* regulations should therefore be disregarded. *See Whaley v. Schweiker*, 663 F.2d 871, 873 (9th Cir. 1981); *accord Soc. Sec. Admin. v. Fed. Labor Rels. Auth.*, 201 F.3d 465, 471 (D.C. Cir. 2000).

Here, the Services have made it clear that, in their expert opinion, consultation *is* required for NWP 12. Not only did the Services specifically use the Corps' NWP program as a *prime example* of a federal program subject to programmatic consultation, NWP024828, but the record evidence shows that the Services continue to disagree with the Corps' "no effect" determination for the 2021 NWPs. While the record does not contain any correspondence with NMFS concerning the current iteration of NWP 12—calling into question whether the Corps avoided engaging with the agency over the 2021 permit or merely failed to document those discussions—FWS did provide a comment letter, which stated that the program "*will directly and indirectly impair recovery of listed species* and may threaten additional imperiled species such that their listing may be warranted," and reiterated that "project-level review" does not relieve the Corps of its "responsibility to review its programs." NWP009604 (emphasis added). The expert agency's determination that NWP 12 may affect listed species and that programmatic consultation is required for the NWPs is certainly more deserving of deference than the Corps' misguided—and illegal—attempt to avoid ESA review. *See Kraayenbrink*, 632 F.3d at 497 (finding it "significant that FWS," the agency with "the more appropriate expertise," concluded that the regulations at issue "*would* affect status species and their habitat" (citation omitted)).

26

The Corps' "Biological Assessment" does not remedy this, as it merely reiterates the Corps' erroneous legal position, and therefore provides no basis for deferring to the Corps' determination. In fact, the Biological Assessment makes clear that the Corps' "no effect" determination is not premised on any scientific analysis. In the Biological Assessment's discussion of the "Effects of the Proposed Action," NWP003595-3602, there is no mention whatsoever of the actual environmental impacts of NWP 12 activities, such as sedimentation and contamination of waterways from spills and leaks. Rather, the Corps merely provides a lengthy, albeit futile, attempt to buttress the same erroneous legal position that this Court already rejected. *See* NWP003596 ("[T]he issuance or reissuance of NWPs does not require ESA section 7 consultation because no activities authorized by any NWPs 'may affect' listed species or designated critical habitat without first completing activity specific ESA Section 7 consultations.").

And while the Biological Assessment may have "recognized that cumulative effects 'are evaluated by assessing the direct and indirect effects that those activities have on the current environmental setting,'" Gov. Br. 40, it never actually analyzes the cumulative impacts of the NWP 12 program and provides no indication of how the agency would gather data to ensure that the aggregate impacts of thousands of NWP 12 projects across the country will not jeopardize listed species, which is the purpose of programmatic review. *See* NWP024829

(programmatic consultations enable the Services "to determine whether a program and its set of measures intended to minimize impacts or conserve listed species are adequately protective"). It merely suggests that the cumulative impacts of NWP 12 are but one adverse effect among many that imperil species. NWP003603-04 ("[T]he NWPs are but a small subset of the many human activities that have been identified as contributing to the decline of species and warranting their listing as endangered or threatened species to be protected under the ESA."). But that is not the relevant threshold for Section 7; in fact, the Corps' acknowledgment that the NWPs play *some* role in the extinction crisis undermines its "no effect" determination. *See Kraayenbrink*, 632 F.3d at 496 (The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus the consultation requirement is "easily triggered") (citation omitted).

Moreover, this concession underscores the need for programmatic review of NWP 12, which would allow the Services to consider the aggregate impacts of the program and thereby address its contribution to the loss of imperiled species through death by a thousand small cuts. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008) (If the Services conduct the "jeopardy analysis in a vacuum," focusing only on the individual agency action at issue, then "a listed species could be gradually destroyed, so long as each step on

28

the path to destruction [wa]s sufficiently modest"). This "slow slide into oblivion is one of the very ills the [ESA] seeks to prevent." *Id.*

In sum, both the law and the facts show that the Corps' erroneous "no effect" determination—which the Corps made in defiance of the expert agencies' opinions and the plain language of the governing regulations—is not entitled to any deference.

### D.   The Corps has unlawfully delegated its ESA duties to permittees

Federal Defendants do not dispute that the Corps has an independent duty to ensure that *any* NWP 12-authorized activity that "may affect" listed species undergoes consultation with the Services. *See* Gov. Br. 51. However, they fail to recognize the inherent risk of allowing self-interested permittees to unilaterally make the threshold effect determination when using NWP 12. As explained, the Corps' reliance on permittees to inform the agency when listed species will be affected by NWP 12 activities is an unlawful delegation of the Corps' clear ESA duties.

Federal Defendants acknowledge that "General Condition 18 *does rely on permittees* to comply with the requirement that they submit a PCN for activities that either 'might affect' or are 'in the vicinity of' listed species or habitat." Gov. Br. 51 (emphasis added). While they contend that this "ensures" that any activities which could affect listed species are brought to the Corps' attention, *id.*, that is

mistaken.[10] Authorizing a self-interested permittee to make a final, unreviewable

determination whether its own project poses any threat to listed species *cannot*

"ensure" that the Corps is always informed of such impacts because permittees

may not have the required knowledge, expertise, experience, or objectivity to

properly report all potential effects. This concern is exacerbated by the fact that

project proponents may often proceed under NWP 12 without any notification to

the Corps, allowing potential impacts to listed species to go unnoticed.

And while a permittees' failure to provide a PCN pursuant to General

Condition 18 where NWP 12 activities "might effect" listed species would

constitute an unauthorized use of NWP 12 and open the permittee to enforcement

action under the CWA or ESA, Gov. Br. 52, that would not resolve *the Corps'*

failure to consult on that NWP 12 activity before it takes place, as the ESA

requires. *See NRDC v. Jewell*, 749 F.3d 776, 779 (9th Cir., 2014) (Section 7

requires that the agency consult with the Services *before* engaging in the action).

Indeed, Federal Defendants fail to explain how the Corps would even know of

---

[10] Federal Defendants' reliance on *Fund for Animals v. Kempthorne*, 538
F.3d 124, 132 (2d Cir. 2008), is misplaced. Gov. Br. 51. There, the court was
considering the Secretary's delegation of authority not to permittees, but to "states
and other agencies." *Id*. at 132. Importantly, the Court noted that "[d]elegation of
statutory responsibility by federal agencies [] to outside parties is problematic
because 'lines of accountability may blur, undermining an important democratic
check on government decision-making,'" and because "outside parties, whether
private or sovereign, might not 'share the agency's national vision and
perspective.'" (internal citations omitted).

such failures to properly report impacts, since the Corps does not have any

mechanisms in place to track NWP 12 projects where the permittee moves forward

without providing a PCN. Therefore, the fact that the Corps is not aware of any

such incidences is meaningless and, indeed, only highlights the lack of

accountability. Gov. Br. 42; Coal. Br. 38. That is why this Court previously found

that the Corps itself—not private parties—must play a role in determining whether

any actions it authorizes triggers the ESA's requirements for project-specific

consultations. *See Northern Plains,* 454 F. Supp 3d at 993-94.

      Finally, while Plaintiffs indeed explained in their Opening Brief that

consultation at the programmatic level would help ensure that mechanisms are in

place to monitor and modify permittee behavior as necessary, Federal Defendants

are correct that programmatic review alone would not alleviate the possibility that

the Corps may fail to engage in project-specific consultation if the agency

continues to rely on permittees to inform it of NWP 12 activities that may affect

listed species. *See* Gov. Br. 52. And whether General Condition 18 is a NWP or an

ESA requirement is inapposite. *Id.* The Corps clearly relies on it to meet its ESA

obligations, which constitutes an unlawful delegation of the Corps' duty to make

the initial determination and thereby ensure against jeopardy. 50 C.F.R. §

402.14(a) ("Each Federal agency shall review its actions at the earliest possible

time to determine whether any action may affect listed species or critical habitat.").

In sum, Federal Defendants have merely repackaged the same arguments that this Court already rejected, and they fail to show any changes to General Condition 18 that would support a different outcome here. The Court should therefore, once again, hold that General Condition 18 is an unlawful abdication of the clear duty that all federal agencies must undergo the mandatory Section 7 consultation process for all agency actions that may affect listed species.

## III.     The NWP 12 environmental assessment violates NEPA

### A.     The EA fails to evaluate "frac-outs"

As set forth in Plaintiffs' Opening Brief, the Corps violated NEPA by failing to evaluate the impacts of frac-outs into U.S. waters—despite acknowledging NWP 12-authorized activities cause frac-outs—based on the Corps' erroneous position that, because it "does not have jurisdiction over inadvertent returns," it need not analyze their impacts. NWP000956, 1033.[11] Federal Defendants make no attempt to defend that position, and instead advance a new argument that is equally flawed and must be disregarded.

Defendants now incorrectly claim that NWP 12 does not authorize horizontal directional drilling ("HDD") and thus does not "cause" frac-outs. That is not only an impermissible *post hoc* rationalization, *Dep't of Homeland Sec.* 140 S.

---

[11] As set forth below, *infra* pages 49-59, the Corps' position that it need not evaluate impacts it does not regulate is arbitrary and capricious.

Ct. at 1909, but it is incorrect. In fact, NWP 12 authorizes the construction of oil

and gas pipelines using HDD, as the attached NWP 12 verifications of HDD

crossings make clear.[12] NWP 12's authorization of HDD under navigable waters

stems from Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403. *See, e.g.,*

NWP000946 (NWP 12 authorizes pipeline construction, including those "that are

routed in or under section 10 waters"). Indeed, one of the requirements to submit a

PCN is if the water crossing requires Section 10 authority, which includes the use

of HDD. NWP000947. There can be no genuine dispute that NWP 12 authorizes

HDD construction activities. [13]

And the Corps has conceded that inadvertent returns are a reasonably

foreseeable effect of NWP 12. *Contra* Gov. Br. 27; NWP001035 ("Other potential

adverse environmental effects *from oil or natural gas pipeline construction* … may

be inadvertent returns of drilling fluids that may occur during horizontal directional

---

[12] *See* Hayes Decl. Ex. A (NWP 12 verification of HDD crossing for
Keystone XL Pipeline) and Ex. B (NWP 12 verification of HDD crossing for
Byron Pipeline). The court can consider these extra-record documents because they
are "necessary to explain technical terms or complex subject matter…" *Lands
Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

[13] NWP 12 *also* authorizes remediation work to respond to frac-outs, 86 Fed.
Reg. at 2867, but that authorization is separate from NWP 12's authorization of
HDD. Thus, Defendants are wrong to state NWP 12 "only mentions" HDD due to
remediation work. Gov. Br. 27.

drilling). Thus, the adverse impacts from frac-outs are undoubtedly a foreseeable result of NWP 12 activities.

Despite the clear casual connection between NWP 12 and frac-outs, the Corps refused to conduct any evaluation of the frequency, risk, or impacts of frac-outs, despite it long being aware of the problem. *See, e.g.*, 81 Fed. Reg. 35198 (June 1, 2016) (acknowledging frac-outs can "adversely affect aquatic organisms if released into bodies of water"). Plaintiffs submitted extensive information on frac-outs in their comments, NWP032565-69, including a 2019 study highlighting the alarming frequency and magnitude of frac-outs associated with four gas pipelines in the Appalachian region, ECF No. 38-8. At one incident, "an estimated two million gallons of drilling fluid contaminated with diesel fuel were spilled into a pristine, protected wetland and covered it in up to 13 inches of drilling mud." *Id*. And this was not an isolated incident—the construction of some pipelines saw over 125 frac-out incidents. *Id*. The Corps ignored all of this information.

Federal Defendants now attempt to downplay the problem by cherry-picking a few benign sentences from one of the Corps' own documents it refused to consider. *See, e.g.*, Gov. Br. 26 ("Frac-Out simply means drilling fluid is released (or there is mud loss) to the ground surface during HDD installation.") (quoting ECF No. 38-6). But the very next sentence of the quoted document acknowledges that frac-outs "[have] become a critical issue" and that they "[pose] grave risks in

environmental sensitive and urban areas." ECF No. 38-6 at 8. The Corps' utter

refusal to acknowledge this critical issue or its significant impacts is a perfect

example of an agency "fail[ing] to consider an important aspect of the problem."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463

U.S. 29, 43 (1983).

### B.     The EA fails to evaluate forested wetlands clearing

Defendants also attempt to cast doubt on the fact that NWP 12 permits

forested wetland clearing. Gov. Br. 28 ("Plaintiff's argument incorrectly assumes

that the removal of trees from a wetland requires a Section 404 authorization.").

That is beside the point. While it may be true that *some* oil and gas pipelines

require forest clearing and do not require a Section 404 permit, at issue in this case

are the pipelines the Corps *has authorized* through NWP 12.

The EA makes clear that NWP 12 causes the clearing (or "conversion") of

forested wetlands, which results in permanent adverse effects. NWP000963 ("If

there are permanent impacts to certain features of these forested wetlands, those

impacts are caused by the activities authorized by NWP 12…."); NWP001036

(NWP 12 activities "may result in the conversion of forested wetlands… [which]

may result in the loss of certain wetland functions, or the reduction in the level of

wetland functions …"); NWP001063. Since NWP 12 indisputably authorizes

forested wetlands clearing, NEPA requires the Corps to evaluate the resulting impacts.

Federal Defendants argue that the EA sufficiently addressed the impacts of forested wetlands clearing. Gov. Br. 28-30. However, the passages they cite merely acknowledge that there will be "permanent adverse effects" and "loss of wetlands functions," but provide no analysis. For example, the EA acknowledges the "irreversible and permanent alteration of forested wetland's functions" from forested wetlands clearing, NWP000963, but declines to discuss the nature, scope, or severity of those impacts. Such "general statements" about possible effects are insufficient to satisfy NEPA's hard look requirement. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004); *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 886–87 (D. Mont. 2020). These general statements are particularly insufficient because the Corps *removed the PCN requirement* for forested wetlands clearing, NWP000961-64, meaning that unlimited amounts of forests can be cleared at each crossing, yet district engineers may never have the opportunity to review the impacts at the project level.

Plaintiffs submitted extensive information on the adverse impacts of forested wetlands clearing, NWP032564-65, including a study detailing impacts to specific primary wetlands functions (e.g., water quality protection, flood storage, sediment control, etc.), as well as a discussion of various stressors that can contribute to

decreasing those functions, ECF No. 38-4 at 16-26. The Corps' refusal to evaluate any of this information or discuss the impacts of forested wetlands clearing is insufficient to satisfy NEPA's "hard look" mandate.[14] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

### C.  The EA fails to evaluate cumulative effects

Plaintiffs' Opening Brief sets forth the myriad cumulative effects from NWP 12 activities that the EA ignored, including the cumulative impacts of numerous pipeline crossings in close proximity. Pls. Br. 40-41. Rather than analyze these impacts, the Corps deferred the analysis to be done by district engineers at the project level, in violation of NEPA. *Id.* at 41-43. Defendants fail to address the specific issues raised by Plaintiffs. While they acknowledge that the cumulative effects analysis must be completed upon issuance of NWP 12, since there is no further NEPA analysis at the project level, Defendants insist that the EA's "national-scale" cumulative effects analysis is sufficient. Gov. Br. 30-31. It clearly is not.

---

[14] Federal Defendants cite *Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685, at *11 (W.D. Okla. Dec. 30, 2013), but that case involved a challenge to the Corps' determination that forested wetlands conversion are not considered a "loss of waters of the U.S." Thus, it has no bearing on whether the Corps took the requisite "hard look" at the impacts of such conversions under NEPA.

Federal Defendants now acknowledge the EA's cumulative effects analysis consists of the same verbatim material the Corps uses for each of the NWPs, regardless of the activity, because it claims "each NWP authorizes the same thing: the discharge of fill material…" Gov. Br. 30-31. But this ignores important distinctions between the activities authorized by various NWPs. For example, NWP 12 authorizes the creation of a 50-100-foot-wide right-of-way, the construction of access roads and pump stations, and unlimited crossings along a single waterway. *See, e.g.*, ECF No. 38-3 at 94-96 (discussing cumulative effects of pipeline construction). Surely these cumulative effects of pipelines are not the same as for all other NWP activities, such as agricultural activities (NWP 41), or seaweed mariculture (NWP 55)). Yet the "national scale" analysis for NWP 12 never even mentions oil or gas pipelines, let alone any of their specific adverse effects. NWP001051-52.

This omission is striking considering the EA repeatedly *acknowledges that NWP 12 activities may have more than minimal cumulative effects*. *See, e.g.*, NWP001018 ("[D]ivision or district engineers may determine that the cumulative adverse environmental effects of activities authorized by this NWP are more than minimal."); NWP000961. The EA even specifies how district engineers should evaluate cumulative effects, by considering the "functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to

which the aquatic resources perform those functions, the extent that aquatic

resource functions will be lost as a result of the NWP activity (e.g., partial or

complete loss), the duration of the adverse effects (temporary or permanent), the

importance of the aquatic resource functions to the region (e.g., watershed or

ecoregion), and mitigation required by the district engineer." NWP001026-27.

Therefore, Defendants cannot dispute that NWP 12 activities *can* have more than

minimal adverse cumulative effects. Those effects, however, go entirely

unaddressed by the EA, in clear violation of NEPA.

This approach to cumulative effects was rejected in *Coal. to Protect Puget*

*Sound Habitat v. U.S. Army Corps. of Engineers*, 417 F. Supp. 3d 1354, 1366

(W.D. Wash. 2019). There, the Corps used the same national-scale cumulative

effects analysis for its issuance of NWP 48, which failed to discuss the myriad

cumulative effects of shellfish activities. *Id*. The court held that the Corps

"ignore[d] its obligation to analyze and quantify [cumulative effects], instead

relying on the district engineers to perform the analysis on a project-by-project

basis.… This abdication of responsibility is not authorized under… NEPA." *Id.*

Nonetheless, the NWP 12 Coalition erroneously claims that the Corps'

cumulative effects analysis has been repeatedly upheld. Coal. Br. 39 (citing *Sierra*

*Club, Inc. v. Bostick*, 787 F.3d 1043 (10th Cir. 2015). But *Bostick* did not consider

that issue, instead ruling that the claim had been waived because no party

submitted comments on cumulative effects. *Id.* at 1051. However, for the 2021 reissuance, commenters submitted voluminous evidence on the cumulative effects of NWP 12 activities, which the Corps ignored. The Corps cannot keep burying its head in the sand in the face of resounding evidence of cumulative effects. *Kraayenbrink*, 632 F.3d 472, 498.

### D.   The EA fails to fully analyze foreseeable impacts of oil and gas pipelines

The EA violates NEPA by failing to address the foreseeable impacts of oil and gas pipelines authorized by NWP 12, including the impacts of spills and leaks into waterways and the pipelines' contributions to climate change. While these are two distinct categories of impacts and are discussed separately below, Federal Defendants justify the exclusion of both from the EA by using the same semantic argument—claiming NWP 12 does not approve or authorize oil and gas pipelines. This argument fails.

NWP 12 unquestionably authorizes discharges of fill material *for the construction of oil and gas pipelines in US waters.* Absent Corps approval, oil and gas pipelines could not be constructed in or under waterways. Because NWP 12 is the federal action that directly authorizes thousands of oil and gas pipelines to be installed, NEPA requires the Corps to evaluate the impacts of those pipelines, including spills and leaks into waterways, and their contribution to climate change.

In arguing otherwise, Defendants rely on a misplaced application of *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) ("*Public Citizen*") that does not withstand scrutiny. In *Public Citizen*, the Court held that NEPA did not require the Federal Motor Carrier Safety Administration ("FMCSA") to analyze the impacts of Mexican trucks operating in the U.S., because FMCSA was statutorily precluded from preventing them from entering the U.S. to begin with; rather, the President—who is not subject to NEPA—had the authority to make the ultimate decision. *Id*. at 766-70. Under those circumstances, the Court found that the agency's decision was not the "legally relevant 'cause'" of the trucks' impacts. *Id.* at 770; 768 ("FMCSA simply lacks the power to act on whatever information might be contained in the EIS."). As the NWP 12 Coalition puts it, *Public Citizen* holds that an agency need not analyze impacts it "has no ability to prevent." Coal. Br. 41.

Here, however, the Corps *does* have the ability to prevent the impacts of thousands of oil and gas pipelines, based on its evaluation of their direct, indirect, and cumulative impacts. Unlike in *Public Citizen*, if the Corps declines to issue NWP 12 because the impacts would be more than minimal, those pipelines cannot be installed in U.S. waters and their environmental impacts would not occur unless the project opponent sought an individual Section 404 permit or significantly revamped the project.

41

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) is illustrative. There, the D.C. Circuit applied *Public Citizen* to FERC's approval of a gas pipeline. The court found that FERC's permit was a "legally relevant cause" of the direct and indirect effects of the pipeline because FERC was tasked with balancing the public benefits of the project against the adverse effects and "could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment." *Id.* at 1373. The same is true for NWP 12. Not only is the Corps' approval under CWA section 404 the "legally relevant cause" of pipeline construction, but the Corps may *only* issue a general permit under Section 404(e) if it determines that the category of activities would have minimal effects on the environment. 33 U.S.C. §1344(e)(1). The Corps' Section 404 regulations require it to broadly evaluate the impacts of the permit under at least 20 public interest factors, and balance the "reasonably foreseeable detriments" against "the benefits which reasonably may be expected to accrue." 33 C.F.R. § 320.4(a)(1).

Defendants' attempt to distinguish *Sierra Club* on the grounds that FERC has broader authority over gas pipelines compared to the Corps' more limited Section 404 authority is therefore immaterial from a NEPA vantage point. The critical fact is that the Corps *can* reject a CWA permit on the grounds that direct, indirect, and/or cumulative environmental impacts would be excessive, and hence the D.C. Circuit's reasoning is just as relevant in the context of NWP 12.

Finally, Federal Defendants try to reframe its exclusion of spills and climate change impacts as a scoping issue to which the Corps is entitled to deference. Gov. Br. 20. But it is not a scoping issue. During the scoping process, the Corps determines the geographic and temporal boundaries the action under review; for example, whether "portions of [a] project beyond the limits of Corps jurisdiction" should be considered in the NEPA analysis. 33 C.F.R. § Pt. 325, App. B (7)(b).[15] The scoping cases on which Defendants rely all involved such matters. *See, e.g.*, *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1041-42 (9th Cir. 2009) (holding NEPA required the Corps to evaluate portions of a project outside its jurisdictional footprint); *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003) (discussing whether agency erred in only considering effects for three-years); *Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*, 941 F.3d 1288, 1301 (11th Cir. 2019) (holding Corps' EA for a phosphate mine reasonably excluded the existing downstream production facilities).[16]

---

[15] Contrary to Defendants' argument, Gov. Br. 31 n.12, these regulations do not apply only to individual permits; rather, they are the only NEPA implementing regulations for "the Corps regulatory program." 33 C.F.R. § Pt. 325, App. B(2).

[16] The NWP 12 Coalition cites several other similarly distinguishable cases that deal with geographic scope rather than foreseeable impacts, Coal Br. 42, including *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1116-117 (9th Cir. 2000). But the Ninth Circuit has since limited that decision and recognized the Corps' obligation to evaluate portions of projects beyond its jurisdiction, in both *White Tanks Concerned Citizens, Inc.,* 563 F.3d at

By contrast here, the *scope* of NWP 12 is not in dispute. The EA purports to evaluate the impacts of NWP 12's approximately 47,750 oil and gas pipeline crossings of U.S. waters over a period of 5-years. At issue is whether the Corps analyzed all foreseeable impacts of those activities as required by NEPA's "hard look" mandate. Thus, the Corps is not entitled to deference. *Grand Canyon Trust v. Fed. Aviation Admin.,* 290 F.3d 339, 341–42 (D.C. Cir. 2002) ("[T]he Court owes no deference to the [agency's] interpretation of NEPA … because NEPA is addressed to all federal agencies…."); *see also Karuk*, 681 F.3d at 1017.

In short, Defendants' erroneous application of *Public Citizen,* which would unduly limit agencies' NEPA obligations to analyzing only the impacts that they directly "regulate," is contrary to decades of case law and must be rejected. [17]

### 1.    NEPA requires the Corps to evaluate oil and gas spills.

As set forth in Plaintiffs' Opening Brief, Pls. Br. 29-30, the Ninth Circuit has recognized the Corps' obligation to evaluate the spill risks from projects it permits. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-

---

1040-42 and *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122-24 (9th Cir. 2005).

[17] Although Defendants now attempt to distance themselves from this position, Gov. Br. 20 n.8, it was the EA's main rationale for avoiding an analysis of oil and gas spills or climate impacts. *See, e.g.*, NWP000952. Thus, any other explanation is a *post-hoc* rationalization that must be rejected.  *See Dep't of Homeland Sec.,* 140 S. Ct. at 1909.

68 (9th Cir. 2005) (applying *Public Citizen* and finding a "reasonably close causal

relationship" between the Section 404 permit and the increased risk of spills from

oil tankers); *accord Sierra Club v. Sigler*, 695 F.2d 957, 968-75 (5th Cir

1983)(same); *Standing Rock Sioux Tribe v. United States Army Corps of

Engineers,* 985 F.3d 1032, 1045-49 (D.C. Cir. 2021) (recognizing Corps obligation

to evaluate oil spill impacts of a pipeline).

Defendants attempt to distinguish these cases by pointing out they involved

individual Section 404 permits rather than NWPs, claiming "the Corps' role may

be larger" with individual permits. Gov. Br. 23. But they do not and cannot explain

how. Indeed, the causal connection between issuing a Section 404 permit for a

pipeline project and the operational spills into waterways from those projects is the

same regardless of whether the Corps issues an individual permit under Section

404(a) or a general permit for thousands of projects a year pursuant to Section

404(e). Under both provisions, the extent of the Corps' jurisdiction is the same: the

agency must decide whether to permit dredge and fill of U.S. waters. Under both

provisions, the Corps must make that decision by applying the public interest

factors at 33 C.F.R. § 320.4(a)(1) and EPA's Section 404(b)(1) guidelines at 40

C.F.R. Part 230. And under both provisions, the Section 404 permit determines

whether the project(s) will be built and operate in U.S. waters.

Defendants fail to provide any authority for the proposition that when issuing NWPs, as opposed to individual permits, they can disregard the *activity* and narrowly focus on discharges of fill. To the contrary, the Corps has acknowledged that "[t]he activities regulated by the Corps, as well as the Corps' analysis of direct and indirect effects" are "the same regardless of whether the Corps processes an individual permit application or uses NWPs or other general permits to authorize the regulated activities." 82 Fed. Reg. 1860, 1889 (Jan 6, 2017); *see also* NWP001033-42 (EA's public interest review evaluating broader impacts from NWP 12 activities, and acknowledging NWP 12 activities would lead to operational oil and gas spills).

Furthermore, courts have recognized that the Corps' NEPA analyses for NWPs cannot be limited to discharges of fill. *See, e.g.*, *Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232, 1242-43 (D. Wyo. 2005) (holding the Corps' EA for a general permit under Section 404(e) violated NEPA because it failed to evaluate impacts to non-wetland resources); *Bostick*, 787 F.3d at 1064 (McHugh, J., concurring) ("[T]he Corps may not limit its NEPA analysis to the consideration of the environmental effects of the discharge of dredged and fill material into jurisdictional waters.").

46

## 2. NEPA requires the Corps to evaluate climate change impacts

As with oil and gas spills, the Corps' sole reason for excluding any consideration of climate impacts is its claim that the Corps "does not have the authority to regulate the operation of any oil or natural gas pipeline, or the emissions that result from combustion of oil or natural gas...." NWP000953. That position is arbitrary and capricious and contrary to NEPA.[18]

Courts have consistently recognized agencies' obligation to take a hard look impacts that will flow from their actions but that they do not themselves regulate, particularly the greenhouse gas emissions from the downstream burning of fossil fuels. *See* Pls. Br. 46-49. For example, in *350 Montana v. Haaland*, 29 F.4th 1158, 1176 (9th Cir. 2022), the court required the Department of Interior's NEPA analysis for a coal mine to evaluate the downstream burning of coal, despite the agency's lack of regulatory authority over burning coal. In *Ctr. for Biological Diversity v. Bernhardt*, the Bureau of Ocean Energy Management was required to analyze the emissions from the eventual foreign consumption of oil, despite its lack of regulatory authority over burning of fossil fuels. 982 F.3d at 740. And in *Sierra*

---

[18] The Center on Environmental Quality recently restored language requiring consideration of "direct, indirect, and cumulative effects," specifically to ensure climate change impacts are considered. 87 Fed. Reg. 23,453, 23,466-67 (April 20, 2022).

*Club v. FERC*, FERC was required to analyze the climate impacts from the end-use burning of gas that the pipeline would transport. 867 F.3d at 1371.

Defendants attempt to distinguish these cases by arguing the agencies had more extensive jurisdiction over the projects at issue, Coal Br. 46-47; but none of those agencies had jurisdiction over the downstream "use" of the fossil fuels and so the rulings in those cases were predicated on the obligation under NEPA to analyze the full range of impacts that would flow from the agencies' actions rather than the precise scope of their statutory jurisdiction. For example, regardless of whether FERC's statutory authority over the pipeline at issue in *Sierra Club* was broader than the Corps' Section 404 authority, FERC certainly had no regulatory authority over the downstream burning of the gas. Nonetheless, the court held that NEPA required the agency to take a hard look at the increased emissions from the downstream burning of the fossil fuels the project would cause.

*Columbia Riverkeeper v. United States Army Corp of Engineers*, No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020) is particularly instructive. There, the court found a Corps EA for a methanol export facility (i.e., a "midstream" facility like pipelines), violated NEPA for failing to evaluate the greenhouse gas emissions attributable to the project, including increased emissions from fracking (i.e., upstream extraction), and from the production of olefins in Asia (i.e., downstream burning). *Id*. at *1-4. Although the Section 404 permit was

limited to discharges of dredge and fill for the construction of the facility, the court rejected the same position the Corps advances here: "The Corps' assertion that these greenhouse gas emissions are outside their jurisdiction does not relieve it of its duty to take a 'hard look.'" *Id*. at 4.

So too in this case. And as with oil spills, an analysis of the climate change impacts would inform the Corps' decision on whether the environmental impacts of authorizing thousands of oil and gas pipelines would have more than minimal environmental effects.[19] *See Robertson*, 490 U.S. at 349 (explaining twin aims of NEPA). And as *Columbia Riverkeeper* makes clear, the Corps' application of the public interest factors, 33 C.F.R. 320.4(a)(1), must include a consideration of greenhouse gas emissions attributable to its permitting action. *Id*. at *7 (finding the Corps' public interest analysis arbitrarily failed to consider the project's detrimental contributions to worldwide greenhouse gas emissions); *see also* NWP001035 (EA's public interest review acknowledging that environmental concerns with NWP 12 pipelines "may include the burning of the fossil fuels that occurs after the oil or natural gas reaches its destination, which produce carbon dioxide that contribute to greenhouse gas emissions"). Since the Corps reissuance

---

[19] The Corps' recently-announced "review" of NWP 12 further undercuts Defendants' argument that any consideration of climate change is outside the bounds of its NWP decision. 87 Fed. Reg. 17,281 (Mar. 28, 2022) (announcing that the Corps will consider whether NWP 12 is consistent with the Biden Administration's climate goals and other environmental concerns).

of NWP 12 results in significant build-out of new oil and gas infrastructure that will contribute to climate pollution by enabling additional extraction, transportation, and end-use burning of oil and gas, NWP032549-51, this is exactly the type of foreseeable impact NEPA requires the Corps to evaluate.[20]

## IV.      NWP 12 violates Section 404(e) of the CWA

NWP 12 authorizes the construction of oil and gas pipelines in U.S. waters, with no limits on their length, the number of water crossings (no matter how close together they are), or the amount of high-quality forested wetlands that are cleared. NWP 12 therefore exceeds the CWA's "minimal impacts" threshold in direct violation of Section 404(e). 33 U.S.C. § 1344(e)(1).

Defendants contend that NWP 12 complies with Section 404(e) based on two methods for ensuring minimal effects: the notion that multiple water crossings along linear projects occur at "separate and distant locations"; and the existence of "post issuance procedures." Neither argument withstands scrutiny.

---

[20] Federal Defendants are wrong in stating Plaintiffs do not challenge the Corps' Finding of No Significant Impact. Gov. Br. 29. As set forth in the Complaint, "the Corps' FONSI for NWP 12 was itself arbitrary and capricious, since the agency failed to make a convincing case that the impacts of issuing NWP 12 are not significant." ECF No. 1 at 47; *see also* ECF No. 45 at 55 (asking the court to vacate the EA/FONSI). As such, the EA/FONSI should be set aside.

**A.      The Corps' "separate and distant" justification is unsupported by the record.**

The Corps' primary justification for allowing unlimited usage of NWP 12 is its assumption that water crossings will be "separate and distant," and therefore only result in minimal impacts, even where a NWP 12 project requires hundreds or thousands of such crossings. NWP000947. Defendants argue this determination is entitled to deference, which (according to Defendants) Plaintiffs can only overcome by showing it "lacked a substantial basis in fact." Gov. Br. 10. (quoting *Bostick*, 787 F.3d at 1055).[21] Plaintiffs easily meet any such burden here.

As the Corps tacitly acknowledges, water crossings located close together on the same waterway and/or in the same watershed can cause more than minimal cumulative effects. *See, e.g.,* 82 Fed. Reg. 1885 ("[T]he distance between those crossings will usually dissipate the direct and indirect adverse environmental effects…."). That is why for linear projects, the Corps' implementing regulations allow it to apply NWPs to multiple crossings of a single waterway linear project *only if* they cross waterbodies at "separate and distant" locations. 33 C.F.R. § 330.2(i) ("[F]or linear projects *crossing a single waterbody several times at*

_____

[21] Defendants misstate the applicable legal test. Under *State Farm*, an action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or if its explanation "runs counter to the evidence before the agency." *State Farm,* 463 U.S. at 43.

*separate and distant locations*, each crossing is considered a single and complete project.") (emphasis added).

The problem is that NWP 12 fails to comply with this requirement because it does not ensure that all water crossings are actually "separate and distant." To the contrary, Plaintiffs provided numerous examples of clustered crossings, often more than ten per mile, without district engineers making any "separate and distant" determinations. *See, e.g.*, NWP0032563; ECF No. 38-3 at 14. The Corps failed to respond to these examples, which renders its decision arbitrary and capricious. *State Farm,* 463 U.S. at 43.

Federal Defendants' attempt to justify the Corps' failure to ensure that water crossings are indeed "separate and distant" by claiming, without any basis in fact or supporting evidence, that Corps districts "establish local guidelines" to identify what separate and distant means at a regional scale. Gov. Br. 15. They do not. The Corps does not dispute that there is no requirement that division or district engineers come up with regional or local definitions of "separate and distant" or that they make any determination that multiple crossings on a proposed pipelines are located on separate and distant crossings. Not surprisingly, because it is not required, it does not occur. Indeed, Defendants cannot provide a *single example* of any division or district engineer ever "establish[ing] local guidelines" to evaluate

whether pipeline crossings are "separate and distant"; or a *single example* of any "separate and distant" determination when authorizing projects under NWP 12.

The Coalition cites *Bostick* to claim that the Corps' use of the "separate and distant" phrase has been upheld. Coal. Br. 49. But *Bostick* dealt with legal claims challenging an earlier version of NWP 12 on which no party had submitted comments, and thus the court declined to rule on that issue because there was no evidence in the record as to the Corps' compliance with the "separate and distant" requirement. *See* 787 F.3d at 1056.

Plaintiff and others have since provided numerous examples of oil and gas pipelines being approved without the Corps ever determining whether water crossings in close proximity were indeed "separate and distant" under any definition. *See, e.g.*, NWP0032563; ECF No. 38-3 at 14. Thus, Plaintiffs have demonstrated that the Corps' "separate and distant" theory is arbitrary and capricious. The Corps cannot continue to bury its head in the sand and ignore "resounding evidence" contradicting its position. *See Blue Mountains Biodiversity Project,* 161 F.3d at 1216) (agency violated the APA by ignoring "resounding evidence" contradicting its conclusion).

Rather than defend its determination on the facts, the Corps continues to urge blind deference, arguing agencies have significant leeway in filling out a regulatory scheme that is "ambiguous." Gov. Br. 15 (citing *Kisor v Wilkie*, 139 S.

Ct. 2400, 2417-18 (2019). But "the possibility of deference can arise only if a regulation is genuinely ambiguous." *Id*. at 2414.

To the extent there is any ambiguity in what "separate and distant" means (i.e., exactly how far apart the crossings must be), the regulation is unambiguous in that it allows a pipeline to use a NWP multiple times *only if* the crossings are located on separate and distant waterways. Therefore, the Corps' unsupported presumption that all water crossings are separate and distant is plainly erroneous and inconsistent with the regulation requiring water crossings on linear projects to actually be located at "separate and distant" locations.[22]

Moreover, it is arbitrary and capricious for the Corps to leave this to local and regional review, without any mechanism at the national level to ensure that NWP 12 meets the requirements of Section 404. In *Coal. to Protect Puget Sound Habitat*, 417 F. Supp. 3d at 1366, the court rejected a similar argument, noting: "there must be a national decision document that actually evaluates the impacts of the proposed activity in light of any regional conditions imposed." The court explained that "the Corps' minimal impact determinations were entirely conclusory and the regional conditions that it assumed would minimize impacts were not [yet]

---

[22] Federal Defendants' argument that courts have upheld the "single and complete project" definition, Gov. Br. 15-16, is inapposite, since Plaintiffs are not challenging the regulatory language but rather NWP 12's violation of that requirement.

in place," and found the NWP record "devoid of any indication that the Corps considered regional data... or evaluated the impacts of the as-yet-unknown regional conditions." *Id*. The same is true here.

Federal Defendants also point to other requirements they claim offer additional protection, such as the (reduced) requirements to submit PCNs. Gov. Br. 16. Those have no bearing on the "separate and distant" question. Plaintiffs have shown that even when PCNs are submitted, the district engineers do not, and have never, apply any "separate and distant" definition, even at a regional level, which has resulted in numerous projects with numerous water crossings in close proximity.

Thus, the Corps' presumption that water crossings will be "separate and distant" is inconsistent with the regulation requiring them to be so, and the Corps' failure to address this issue at the national level is arbitrary and capricious and violates Section 404(e)'s minimal effects mandate. *State Farm,* 463 U.S. at 43.

## B.   NWP 12's post-issuance procedures do not ensure that a project will have minimal effects

As set forth above and in Plaintiffs' Opening Brief, Defendants' contention that the Corps complies with 404(e)'s minimal effects threshold through project level review is not supported by the record. Indeed, Defendants' argument has an obvious flaw—the Corps admits that such review will not occur for approximately 1,450 NWP 12 activities per year, or 7,250 over the five-year lifespan of NWP 12.

NWP0001052.[23] In other words, for at least 7,250 uses of NWP 12, the applicant will never submit a PCN and district engineers will have no opportunity to evaluate whether the NWP 12 activities would cause more than minimal cumulative effects, and/or whether those crossings would be located at "separate and distant" crossings. Defendants' reliance on "post-issuance procedures," Gov. Br. 11-12, is therefore mistaken.

Unable to avoid the EA's own estimates, Federal Defendants shift to arguing that PCNs are *often* required and that only a "small number" do not require a PCN. Gov. Br. 11-13. But 7,250 is not a "small number" of water crossings, and regardless, Section 404(e) contains no *de minimis* exemption for any specific amount of NWP activities, let alone many thousands. Similarly, Defendants attempt to downplay the import of these 7,250 crossings that will escape project-level review by claiming that they would only impact 17 acres of wetlands. Gov. Br. 13. But Defendants have not shown that this would result in only minimal impacts, and importantly, that number does not include the unlimited amount of forested wetlands clearing that NWP 12 authorizes per crossing, which undisputedly has adverse environmental impacts. *See* NWP00961-64 (eliminating the requirement to submit a PCN for mechanized clearing of forested wetlands).

---

[23] In fact, this number is likely low. *See* 33 C.F.R. § 330.1 ("In *most cases*, permittees may proceed with activities authorized by NWPs without notifying the [Corps].") (emphasis added).

And furthermore, impacts to even a few acres of wetlands could exceed the minimal effects threshold, particularly since there is no way for district engineers to ensure minimal cumulative effects of pipeline crossings clustered close together.

Defendants mischaracterize Plaintiffs' argument to be that 404(e) can *never* be satisfied through the use of project-level review, and cite cases upholding the Corps' use of post-issuance procedures. Gov. Br. 11-12. But that misses the point. Plaintiffs do not argue project-level review is prohibited by 404(e); rather, they contend that, by the Corps' own admission, such review will *never occur* for many thousands of NWP activities. This distinguishes NWP 12 from the permit at issue in *Ohio Valley Environmental Coalition v. Bulen*, which required "post-issuance individualized authorization" for all projects. 429 F.3d 493, 501 (4th Cir. 2005). Accordingly, Defendants' arguments concerning the Corps' legal interpretation of Section 404(e) are irrelevant, as are the cases they cite discussing the "timing of post-issuance procedures." Gov. Br. 11-12. In each of those cases, project-level review was assured. Not so here.

For the same reason, Defendants' reliance on *Bostick*, 787 F.3d at 1056-60 fails. There, the court upheld the 2012 version of NWP 12, for which the Corps made no admission that many thousands of projects would escape that review

altogether.[24] In the 2021 version, the EA's admission of that fact distinguishes this case from *Bostick*, and provides concrete evidence that undercuts any assumption that NWP 12's project-level procedures ensure all NWP 12 projects will have only minimal cumulative effects. *State Farm*, 463 U.S. at 43; *Cty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999). This in in direct violation of CWA Section 404(e).

Finally, Federal Defendants argue that it would be "impractical, if not impossible" to require a *final* minimal effects determination upon issuance of a NWP. Gov. Br. 10. But the Corps is not required to issue a NWP covering all oil and gas pipelines of any size nationwide. It has chosen to do so, and therefore it cannot now complain that "evaluating impacts on a nationwide level is nearly impossible" and attempt to "avoid its 'statutory obligations to thoroughly examine the environmental impacts of permitted activities" by promising that the district engineers will do it. *Coal. to Protect Puget Sound Habitat,* 417 F. Supp. 3d 1367 (quoting *Ohio Valley Env't Coal. v. Hurst*, 604 F. Supp. 2d 860, 901-02 (S.D.W. Va. 2009). Simply put, Defendants have failed to make a convincing argument that NWP 12 meets the requirements of Section 404(e).

---

[24] *See* Decision Document for NWP 12 (2012) at 37, available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/6783 (estimating 7,900 uses of NWP 12 per year without acknowledging any, let alone thousands, would escape project-level review).

## V.       Defendants' arguments regarding remedy are both premature and flawed

Federal Defendants argue that, should Plaintiffs prevail, the Court should merely remand without vacating. Gov. Br. 53. However, Plaintiffs agree with the NWP 12 Coalition that the Court should provide an opportunity for further briefing and factual development regarding the appropriate remedy, Coal. Br. 50, particularly since the nature of the legal violations discerned by the Court may have a significant bearing on the kind and scope of relief. *See also Native Ecosystems Council v. Marten,* No. CV 18-87-M-DLC, 2020 WL 1479059, at *15 (D. Mont. Mar. 26, 2020) (Granting, in part, Plaintiffs' Motion for Summary Judgment against the Forest Service for violations of ESA and NEPA, and ordering "that the parties may submit additional briefing on the appropriate remedy"). In any case, Defendants and Amici have made several erroneous legal and factual claims regarding the relief issue, which Plaintiffs address below.

It is well established that vacatur is the presumptive remedy for ESA and APA violations. *See Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1121-22 (9th Cir. 2018); *accord* 5 U.S.C. § 706(2)(A) (directing courts to "set aside agency action . . . found to be . . . not in accordance with law"). In evaluating whether to depart from the presumptive remedy of vacatur, courts generally look to two factors: (1) "the seriousness" of an agency's errors; and (2)

"the disruptive consequences" that would result from vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *accord Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020). Although Defendants have not demonstrated that either factor weighs in favor of remand without vacatur here, the Court would benefit from additional factual development and briefing before deciding the appropriate remedy.

Plaintiffs have alleged violations of the ESA, NEPA, and the CWA, all of which are serious given the scope and potential impacts of NWP 12, which authorizes oil and gas pipeline to be constructed through waterways nationwide, often with no further Corps review. However, the parties would be in a better position to provide legal authority regarding the seriousness of the agency's errors after this Court issues a decision identifying the Corps' specific legal violations. Likewise, following a ruling on the merits, the parties will be better suited to determine whether the Corps could easily correct any errors on remand, or "whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).

Furthermore, additional factfinding and briefing may be necessary where, as here, "there is a dearth of evidence concerning the impact of vacatur…." *350 Montana* 2022 WL 999919 at *13. For example, Defendants and Amici have

argued that vacating NWP 12 would make it harder to undertake necessary repairs and maintenance of pipelines. Plaintiffs' primary concerns, however, are focused on the use of NWP 12 for the construction of new fossil fuel pipelines, and therefore Plaintiffs are amenable to vacatur being limited to new construction projects. That would eliminate many of the concerns raised by Defendants regarding the disruptive effect of vacatur. However, it remains unclear exactly how many NWP 12 projects involve new development rather than repairs and maintenance. In that regard, Federal Defendants' declaration raises more questions than it answers, as it provides an "estimate" of 427 pending verifications based on a "sample" of PCNs, but also claims that should NWP 12 be vacated, approximately 306 pipeline projects would require individual permits annually. Moyer Decl. ¶¶ 6, 8. However, this includes uses of NWP 12 for repairs and maintenance, *id.,* so it is unknown how many new construction projects would actually be affected by vacatur of NWP 12. This is the sort of factual development that further briefing would allow for.

Defendants and Amici make other broad arguments regarding the disruptive consequences that would result from vacatur, but their assertions are based on unsubstantiated claims and incomplete facts. For example, Defendants make broad statements about impacts to the economy and national security. *See, e.g.,* Coal. Br. 51 (claiming that "delay and expense that would result from any unavailability of

NWP 12 would harm… our nation's economy, energy security, and energy diversity"); Chamber Br. 4-6 (arguing that NWP 12 "play[s] a critical role in ensuring our nation's energy security and economic vitality," and that Plaintiffs' requested relief could cause significant delay of unspecified projects). But they fail to identify *any* specific oil or gas pipelines that plan to use NWP 12 in the foreseeable future that are purportedly important to energy security. Any claim that vacatur of NWP 12 would impede national energy security would require some evidence identifying how any purported delay due to the need to seek an individual 404 permit would impact proposed pipeline activities—evidence that Defendants have not provided. Again, further briefing would allow the parties to fully address those allegations.

Additionally, Defendant and Amici's arguments regarding the disruptive effects of vacatur may be undercut by the fact that the Corps recently announced a new review of NWP 12, through which the agency will consider whether to make changes to the permit to be consistent with the Biden Administration's climate goals and other environmental concerns. *See* 87 Fed. Reg. 17,281 (Mar. 28, 2022). This suggests that the Corps may alter the permit in the foreseeable future irrespective of any ruling by the Court, and raises a host of questions about the timing of this review *vis a vis* the instant litigation and potential remedy, and

whether applicants have a reasonable expectation to rely on NWP 12 until its scheduled expiration.

The nature of the Court's summary judgment ruling may also have a significant bearing on whether particular relief—either alternative, or in addition, to vacatur—would be appropriate. For example, should the Court once again rule in favor of Plaintiffs on their ESA claim, at minimum it would be appropriate for the Court to set forth a date certain by when the Corps must complete the consultation process—particularly given the agency's complete failure to comply with the Court's remand order and declaratory relief in the prior case.[25] That would provide a specific time frame for complying—e.g., 180 days, which is well more than the 90 days generally required for Section 7 consultation, 50 C.F.R. § 402.14(e)—which would not only ensure that the required consultation is actually completed this time, but would also limit the duration of any purported harm to permittees.

---

[25] Although the Court's remand and declaratory relief in the prior challenge to NWP 12 were never disturbed on appeal, there is no evidence that the Corps took even initial steps to carry out the ESA consultation that the Court held was required. Indeed, Plaintiffs made repeated inquiries to the Corps in an effort to ascertain the status of the remand, which were met with silence. With this backdrop, the government's request for a remand-only remedy is therefore tantamount to a request for no relief at all, regardless of the legal violations found by the Court.

In short, given the circumstances and notwithstanding the legal infirmities in the remedy arguments made by Defendants, Plaintiffs agree with the NWP 12 coalition that, following any finding by the Court of a legal violation, it would be appropriate to allow for further factual development and legal briefing before determining the appropriate remedy.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny Defendants' cross-motions for summary judgment.

Dated: April 29, 2022                    Respectfully submitted,

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

/s/ Jared Margolis
Jared Margolis
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

/s/ Eric Glitzenstein
Eric Glitzenstein
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org
*Attorneys for Center for Biological
Diversity, Friends of the Earth, and
Waterkeeper*

/s/ Doug Hayes
Doug Hayes
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
*Attorney for Sierra Club and Montana
Environmental Information Center*

## WORD COUNT CERTIFICATION

I certify that the foregoing response contains 14,990 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

<u>/s/ Doug Hayes</u>

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.

/s/ Doug Hayes