# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

       Plaintiffs,

       v.

LT. GEN SCOTT A. SPELLMON, et al.,

       Defendants,

AMERICAN GAS ASSOCIATION,
et al.,

       Defendant-Intervenor,

STATE OF MONTANA,

       Defendant-Intervenor.

**Case No: 22-cv-2586-CKK**

**Plaintiffs' Supplemental Memorandum in Support of Motion for Summary Judgement**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT .............................................................................................................. 2

   I.   Plaintiffs have Established Standing to Bring their ESA Claim ........................................ 2

      A.  Plaintiffs have established *Havens* organizational standing ....................................... 2

      B.  Plaintiffs have established standing for their procedural injury claims ...................... 4

   II.  Programmatic Consultation is Required for NWP 12 ...................................................... 7

  III.  The Corps Unlawfully Delegated the Initial Effects Determination to Permittees .......... 11

  IV.  The Corps' Environmental Assessment for NWP 12 Violated NEPA ............................ 13

      A.  The Corps violated NEPA by failing to analyze the risks and consequences of oil and gas leaks and spills .................................................................... 14

      B.  The Corps' EA fails to adequately analyze frac-outs, forested wetlands, and cumulative impacts ........................................................................... 17

   V.  NWP 12 Violates CWA Section 404(e) ........................................................................ 19

  VI.  Remedy ........................................................................................................ 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abigail Alliance v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) ........................................................................ 3

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ...................................................................... 20

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (D.C. Cir. 2019) ........................................................................ 4

*Am. Rivers v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ........................................................................ 18

*\*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) ................................................................ 9

*ASPCA v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ..................................................................... 3, 4

Baltimore Gas & Electric Co. v. NRDC,
  462 U.S. 87 (1983) ...................................................................................... 17

Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n,
  449 F.2d 1109 (D.C. Cir. 1971) .................................................................... 16

*Center for Biological Diversity v. U.S. Department of the Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ........................................................................ 9

*Conner v. Burford*,
  848 F.3d 1441 (9th Cir. 1988) ........................................................................ 9

*\*Conservation Law Found. v. Ross*,
  422 F. Supp. 3d 12 (D.D.C. 2019) .................................................................. 8

*\*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ........................................................................ 5

*Ctr. for Biological Diversity v. Salazar*,
   770 F. Supp. 2d 68 (D.D.C. 2011) ....................................................................... 8

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   941 F.3d 1288 (11th Cir. 2019) ....................................................................... 17

*Dakota Access, LLC v. Standing Rock Sioux Tribe*,
   142 S. Ct. 1187 (2022) ....................................................................... 14

*Del. Riverkeeper Network v. FERC*,
   243 F. Supp. 3d 141 (D.D.C. 2017) ....................................................................... 6

*Del. Riverkeeper Network v. FERC*,
   753 F.3d 1304 (D.C. Cir. 2014) ....................................................................... 17

*Dep't of Transp. v. Public Citizen*,
   541 U.S. 752 (2004) ....................................................................... 16

*Environmental Defense Center v. BOEM*,
   36 F.4th 850 (9th Cir. June 3, 2022) ....................................................................... 9

*Equal Rights Center v. Post Properties, Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ....................................................................... 3

*Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ....................................................................... 3

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ....................................................................... 11

*Gulf Restoration Network v. Haaland*,
   47 F.4th 795 (D.C. Cir. 2022) ....................................................................... 19

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ....................................................................... 3

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ....................................................................... 2

*Humane Soc'y of the United States v. U.S. Dep't of Agric.,
    41 F.4th 564 (D.C. Cir. 2022) ................................................................................ 3

Ill. Commerce Comm'n v. ICC,
    848 F.2d 1246 (D.C. Cir. 1988) ........................................................................... 12

Ill. Pub. Telecomms. Ass'n v. FCC,
    123 F.3d 693 (D.C. Cir. 1997) ............................................................................. 19

Mendoza v. Perez,
    754 F.3d 1002 (D.C. Cir. 2014) ............................................................................. 4

N.Y. v. Nuclear Regulatory Comm'n,
    681 F.3d 471 (D.C. Cir. 2012) ............................................................................. 15

Nat'l Council for Adoption v. Blinken,
    4 F.4th 106 (D.C. Cir. 2021) ................................................................................. 6

Nat'l Parks Conservation Ass'n v. Jewell,
    62 F. Supp. 3d 7 (D.D.C. 2014) ............................................................................ 8

*Nat'l Wildlife Fed'n v. Brownlee,
    402 F. Supp. 2d 1 (D.D.C. 2005) ....................................................................... 1, 8

Nken v. Holder,
    556 U.S. 418 (2009) ........................................................................................... 11

North Slope Borough v. Andrus,
    486 F. Supp. 332 (D.D.C. 1980) ........................................................................... 9

*Northern Plains Res. Council v. U.S. Army Corps of Eng'rs,
    454 F. Supp 3d 985 (D. Mont. 2020) ......................................................... 1, 10, 11

*Ocean Advocates v. U.S. Army Corps of Eng'rs,
    402 F.3d 846 (9th Cir. 2005) .............................................................................. 16

Ouachita Riverkeeper, Inc. v. Bostick,
    938 F. Supp. 2d 32 (D.D.C. 2013) ................................................................... 2, 18

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ................................................................................. 5

*PETA v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................................... 3

*Pub. Employees for Envtl. Responsibility v. Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016) ............................................................................. 17

*Public Employees for Envtl. Responsibility v. Beaudreau*,
    25 F. Supp. 3d 67 (D.D.C. 2014) ........................................................................... 12

*Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*,
    --- F.Supp.3d ---, 2022 WL 5434208 (D.D.C. 2022) ......................................... 2, 17

*Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*,
    2021 WL 430054 (D.D.C. Feb. 7, 2021) ................................................................ 14

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ....................................................................... 12

*San Juan Audubon Soc'y v. Wildlife Servs.*,
    257 F. Supp. 2d 133 (D.D.C. 2003) ......................................................................... 6

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) ............................................................................ 2, 16

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ............................................................................. 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ........................................................................... 13, 16

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010) ......................................................................... 19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) .................................................................. 14, 16

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ................................................................. 14

*State of Idaho v. ICC*,
   35 F.3d 585 (D.C. Cir. 1994) ..................................................................... 12

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..................................................................................... 6

*United States Army Corps of Eng'rs v. North Plains Res. Council*,
   207 L. Ed. 2d 1116 (2020) ...................................................................... 1, 11

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ................................................................ 5, 6

## Statutes

Clean Water Act § 404(e) .............................................................................. 16

16 U.S.C. § 1536(a)(2) ............................................................................ 11, 13

16 U.S.C. § 1539(a)(2)(B) .............................................................................. 11

33 U.S.C. § 403 ............................................................................................... 17

33 U.S.C. §1344(e)(1) .................................................................................... 16

42 U.S.C. § 433(2)(C) .................................................................................... 13

## Regulations

33 C.F.R. §320.2 ............................................................................................ 18

33 C.F.R. pt. 325, App. B, § 7 ....................................................................... 13

40 C.F.R. § 1508.1 ......................................................................................... 13

50 C.F.R. § 402.14(c) .............................................................................. 7, 8, 9

50 C.F.R. § 402.02 ........................................................................................... 7

## INTRODUCTION

This case concerns the U.S. Army Corps of Engineers' 2021 reissuance of Nationwide Permit 12 ("NWP 12"), a general permit that authorizes the construction of oil and gas pipelines through rivers, streams, and wetlands across the country. As explained in Plaintiffs' summary judgment briefing, the Corps once again violated the Endangered Species Act (ESA), the National Environmental Policy Act (NEPA), and the Clean Water Act (CWA) when it reissued NWP 12 during the final days of the Trump Administration.

This case follows litigation before the Montana District Court over the 2017 iteration of NWP 12, where the court ruled that the Corps violated the ESA by failing to undertake Section 7 consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (together the "Services") to consider the cumulative adverse effects of NWP 12 on protected species. *Northern Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp 3d 985 (D. Mont. 2020). Indeed, by once again refusing to consult on the reissuance of NWP 12 in 2021, the Corps disregarded not only the Montana District Court's ruling, but this court's ruling in *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), which likewise held that consultation on NWP 12 was "necessary to avoid piece-meal destruction of . . . habitat through failure to make a cumulative analysis of the program as a whole." *Id*. at 10. And when the Corps sought a stay from the U.S. Supreme Court of the decision in *Northern Plains*, the Court narrowed the *injunctive* relief, but it did *not* stay the declaratory relief or remand, clearly signaling that the merits ruling was sound. *United States Army Corps of Eng'rs v. North Plains Res. Council*, 207 L. Ed. 2d 1116 (2020). This should foreclose the Corps' reliance on the same baseless legal arguments.

This Supplemental Brief is intended to provide the Court with D.C. Circuit precedent supporting Plaintiffs' arguments in their summary judgment briefing, which establishes that

Plaintiffs are entitled to summary judgment and a declaration that the Corps' 2021 issuance of NWP 12 violated the ESA, NEPA, the CWA, and the APA, as well as vacatur of the permit. Plaintiffs have focused on supplementing those arguments that relied on Ninth Circuit caselaw. However, in light of the Court's opinion in *Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*, --- F.Supp.3d ---, 2022 WL 5434208 (D.D.C. 2022), Plaintiffs are not pursuing their argument that the Corps violated NEPA by failing to address climate change.

## ARGUMENT

I. **Plaintiffs have Established Standing to Bring their ESA Claim[1]**

A.  **Plaintiffs have established Havens organizational standing**

This case presents a quintessential example of organizational standing pursuant to the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which held that an organization may establish injury-in-fact if it can demonstrate an agency action results in: (1) frustration of its central organizational mission; and/or (2) diversion of its resources to combat the allegedly unlawful conduct. Plaintiffs have established that protecting listed species is at the heart of their organizational missions and provided declarations explaining how the Corps' failure to consult on NWP 12 frustrates that mission and requires Plaintiffs to divert and expend resources to learn about the effects of NWP 12 on listed species. ECF No. 78 at 9-10. In fact, at oral argument before Judge Morris, counsel for the government admitted that the Corps

---

[1] Plaintiffs focus here on standing for their ESA claim, as no party has challenged standing for the NEPA and CWA claims. In any event, Plaintiffs' previously submitted member declarations clearly satisfy the applicable standing requirement under Supreme Court and Circuit precedent for those claims. *See* ECF Nos. 45-1 through 45-8; *see also Sierra Club v. FERC*, 827 F.3d 36, 44 (D.C. Cir. 2016) (finding standing in NEPA procedural injury case); *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F. Supp. 2d 32, 41 (D.D.C. 2013) (finding standing in challenge to NWP 12 verification).

refuses to make information about NWP 12 available to the public, and therefore Plaintiffs "would have to do some digging to find out about projects." ECF No. 100 at 44. This demonstrates how the Corps has set up NWP 12 in such a way as to require Plaintiffs to devote significant resources to uncover how NWP 12 is being used in order to protect their interests.[2]

As in the Ninth Circuit, the D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (citing *Abigail Alliance v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)).[3] Indeed, the D.C. Circuit recently reaffirmed its adherence to *Havens*, holding that an organization has standing where it can demonstrate "concrete and demonstrable injury to [its] activities[]'" beyond "'a mere setback to [its] abstract social interests." *Humane Soc'y of the United States v. U.S. Dep't of Agric.*, 41 F.4th 564, 567 (D.C. Cir. 2022) (citing *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)).

*Humane Society* is directly on point. There, the court found that because the agency did not implement "a more rigorous inspection regime" regarding the treatment of show horses, and thus the Humane Society had to "redirect its limited time and resources" in order to "identify, investigate, publicize, and counteract" the agency's action that affected its organizational mission, the organization "easily" met the requirements for *Havens* standing. *Id.* (citing PETA,

---

[2] Even with "digging," Plaintiffs have found obstacles thrown in their path. Because the Corps has cloaked the NWP review process in secrecy, Plaintiffs have had to resort to the Freedom of Information Act in an effort simply to uncover where and how the permit has been implemented. Even then, the Corps has failed to respond, necessitating that Plaintiffs devote even more organizational time and resources. ECF No. 78 at 7 fn. 3, 10-11.

[3] *See also PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015); *Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011); *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987).

797 F.3d at 1094).[4] Plaintiffs have likewise demonstrated that the Corps' actions—i.e., its failure to consult on an action that authorizes thousands of projects while shielding from the public even rudimentary information on the location and impacts of those projects—forces Plaintiffs to divert their limited resources to fill the gap left by the agency, including through having to identify, investigate, and counteract the Corps' failure to comply with the ESA in connection with the programmatic decision at issue. *See* ECF No. 78 at 10-11.

Plaintiffs have therefore shown that the Corps' failure to consult creates a "direct conflict" with the organizations' mission to protect imperiled species. *ASPCA*, 659 F.3d at 25 (citation omitted). And here, the relevant expenditure of resources is not on this litigation, but rather is necessary to ascertain the effects of NWP 12 on listed species that Plaintiffs and their members have a concrete interest in protecting. *See id.*; ECF No. 78 at 10-11; *see also Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2019) (finding standing where the agency's failure impaired the "organizational interests by depriving it of key information that it relies on to fulfill its mission"). Thus, Plaintiffs have established *Havens* organizational standing under this Circuit's precedent.

### B.  Plaintiffs have established standing for their procedural injury claims

Although *Havens*' standing is sufficient for the Court to reach the merits, Plaintiffs have also established that the Corps' failure to consult with the Services on the reissuance of NWP 12 harms the interests of the members of the Plaintiff organizations. Plaintiffs have provided declarations detailing the harm to listed species that members study, enjoy observing, and work to protect from NWP 12 activities, as well as examples of NWP 12-permitted pipelines that

---

[4] The Court also noted that a plaintiff seeking to enforce procedural requirements must demonstrate "only 'a causal relationship between the final agency action and the alleged injuries.'" *Id.* (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)).

implicate such species. Plaintiffs therefore have standing under D.C. Circuit precedent for their claim that the Corps flouted the procedure mandated by the ESA.[5]

As in the Ninth Circuit, a claim that an agency failed to engage in Section 7 consultation is an "archetypal procedural injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). In the context of ESA Section 7, Plaintiffs may show an injury-in-fact where the failure to consult "affects its members' concrete aesthetic and recreational interests," by causing the agency to "overlook the creation of a demonstrable risk" that harms the members' particularized interests. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) (citation omitted). That is precisely what occurred here. Plaintiffs have shown that the Corps' failure to consult on the NWP 12 program allows it to "overlook the creation of a demonstrable risk," *id.*, by ignoring the impacts of the program as a whole, which the Corps acknowledges will be used for thousands of activities that require ESA consultation because they "may affect" listed species. *See* NWP001046; ECF No. 45 at 18-21.

Furthermore, Plaintiffs provided declarations explaining how the Corps' violation of the ESA directly harms the interests of the Plaintiff organizations and their members. *See* ECF No. 78 at 14-15, 17-18. For example, Plaintiffs' declarations set forth impacts to listed species from NWP 12 through habitat loss and contamination from oil spills, which harms Plaintiffs' members' academic, recreational, conservational, and aesthetic interests. *See id.* This includes not only rivers with endangered sturgeon that members observe and study and that are likely to

---

[5] Notably, Defendants' standing arguments are predicated on the same erroneous legal position that has already been rejected: they argue that there is no injury-in-fact because there is no harm to listed species from NWP 12 due to the Corps undertaking project-specific consultations. Not only is this argument erroneous, but for purposes of standing the Court must accept as valid the merits of Plaintiffs claims. *See Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of [the] legal claim.").

be affected by NWP 12 activities, but also specific examples of pipeline projects approved under the 2021 iteration of NWP 12 that adversely affect the concrete interests of Plaintiffs' members.[6] *Id.* Plaintiffs' position is therefore consistent with the Supreme Court's decision in *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009), because Plaintiffs provided declarations connecting the procedural injury to the concrete interests adversely affected by the procedural deprivation. *See WildEarth Guardians*, 738 F.3d 298 at 305. Unlike *Summers,* where the plaintiffs failed to point any specific application of the challenged regulation that was allegedly causing their members harm, *Summers*, 555 U.S. at 494, Plaintiffs here have provided declarations showing specific examples of harm to their interests from NWP 12. Plaintiffs need show no more to establish standing under Supreme Court and Circuit precedent.

As the court has explained, "as long as the procedural requirement is designed to protect a threatened, concrete interest of the plaintiff, the violation is sufficient to grant the plaintiff standing." *San Juan Audubon Soc'y v. Wildlife Servs.*, 257 F. Supp. 2d 133, 137 (D.D.C. 2003) (citation omitted). In this context, "the procedural-rights plaintiff must show 'that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.'" *Id.* (quoting *City of Waukesha*, 320 F.3d at 234) (citation omitted). Plaintiffs have shown at least a "substantial probability" of harm occurring due to the Corps' wholesale failure to comply with the process mandated by ESA Section 7(a)(2). *See also Del. Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 151 (D.D.C. 2017) (explaining that for membership

---

[6] While Defendants have argued that Plaintiffs' supplemental standing declarations are not properly before the Court, *see* ECF No. 81 at 19, that position is inconsistent with the D.C. Circuit's recent decision in *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021), which held that courts may allow supplemental standing declarations with a response as long as they do not "raise an entirely new theory of standing," but rather are being used to just "shore up" the initial statements, which is precisely what occurred here. *See* ECF No. 78 at 7-8.

standing, an organization need only show "high likelihood" rather than a certainty "that its members will suffer concrete and particularized injuries").

Indeed, the Court in *Del. Riverkeeper Network* held that it does not matter, for purposes of standing, that the exact location of an agency action is not known when the complaint is filed; that would require a court to "interpret standing in such a way that would render declarative or injunctive relief unavailable under any circumstances, if the conduct giving rise to imminent injury had not yet occurred." *Id*. at 150. Here, as in *Del. Riverkeeper Network*, Plaintiffs provided declarations "describing some past pipeline-related injuries," "as well as future likely injuries of the type stated in the Complaint." *Id*. And, consistent with *Summers*, Plaintiffs have shown concrete injury that is not hypothetical or relying on statistical probability that some harm might occur, as the Corps admits that *thousands* of NWP 12 activities "may affect" listed species and the Corps' Decision Document shows a substantial risk that harm will occur. *See* ECF No. 45 at 15-18. Thus, notwithstanding Defendants' efforts to prevent Plaintiffs from even learning about how NWP 12 is being implemented—which reinforces Plaintiffs' *Havens* standing— Plaintiffs have stated a "sufficiently concrete and imminent injury, tethered to the alleged [ESA] violation, for the purposes of standing." *Del. Riverkeeper Network*, 243 F. Supp. 3d at 151.

## II.   Programmatic Consultation is Required for NWP 12

As Plaintiffs established in their summary judgment briefing, ESA Section 7 consultation is required for federal programs that may affect listed species, so that the expert agencies may consider the aggregate impacts of the action and establish measures to avoid, minimize, or offset adverse effects on listed species and critical habitat. *See* 50 C.F.R. §§ 402.02, 402.14(i)(6). Here, there can be no doubt that the reissuance of NWP 12 is an agency action that may affect listed species. *See* ECF No. 45 at 15-18. Indeed, the Corps' concession that thousands of NWP 12-authorized activities "may affect" listed species, NWP001046, confirms that the Permit as a

whole surely meets the "low" threshold for ESA consultation. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 12-13 (D.D.C. 2014) ("The 'may affect' threshold for triggering the consultation duty under section 7(a)(2) is low.") (citation omitted). The failure to consult on NWP 12 was therefore a clear violation of one of the ESA's most vital safeguards for imperiled species. *See Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68, 71 (D.D.C. 2011) (Section 7 of the ESA provides "vital protections" for listed species).

Plaintiffs' arguments are not only supported by the plain language of the ESA and implementing regulations, but also this court's precedent. In *Brownlee*, the court held that the Corps' previous reissuance of the NWPs—including for pipelines under NWP 12—to be final agency action that required ESA consultation. There, as here, the Corps had refused to consult on the basis that project-specific analyses would avoid any harm to species. 402 F. Supp. 2d at 10. The court disagreed, reasoning that the ESA regulations are clear that "[a]ny request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole." *Id.* (quoting 50 C.F.R. § 402.14(c)). The court concluded that "overall consultation for the NWPs is necessary to avoid piece-meal destruction of . . . habitat through failure to make a cumulative analysis of the program as a whole." *Id.* Thus, this court has already determined that NWP 12 requires ESA Section 7 consultation at the programmatic level.

This court has made similar rulings in parallel contexts. In *Conservation Law Found. v. Ross*, 422 F. Supp. 3d 12 (D.D.C. 2019), the National Marine Fisheries Service had promulgated a comprehensive Habitat Amendment, which altered rules governing New England's fisheries, but it declined to consult on the Amendment itself, contending it had "discretion to determine,

'on a fishery-by-fishery basis,' whether consultation was needed." *Id.* at 29. The court rejected

that argument, holding that:

> the 'fishery-by-fishery' approach is not permitted by ESA regulations or the caselaw, even when consultation does occur. ESA regulations permit grouping individual actions for purposes of consultation, but expressly caution that any such groupings "do[] not relieve the Federal agency of the requirements for considering the effects of the action as a whole." 50 C.F.R. § 402.14(c). The reason for this is intuitive: "[S]uch impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species."

*Id.* at 30 (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C.

2003). These precedents, in turn, are consistent with the approach adopted by the Ninth Circuit,

which recently reaffirmed that "site-specific consultation cannot cure a failure to consult at the

programmatic level." *Environmental Defense Center v. BOEM*, 36 F.4th 850, 891 (9th Cir. June

3, 2022) (citing *Conner v. Burford*, 848 F.3d 1441, 1455 (9th Cir. 1988)). Indeed, this court

looked to the Ninth Circuit's decision in *Conner* when it held in *American Rivers* that the Corps

may not segment its analysis because the ESA requires a comprehensive assessment of the

impacts of the overall activity. 271 F. Supp. at 255. As this court recognized, "the ESA requires

more; it 'requires that the consulting agency scrutinize the *total scope* of agency action.'" *Id.*

(quoting *North Slope Borough v. Andrus,* 486 F. Supp. 332, 353 (D.D.C. 1980)). *Conner* is

therefore instructive, and its holding—that "the ESA on its face requires the [agency] . . . to

consider all phases of the agency action"—confirms that the ESA requires programmatic review

of NWP 12 to ensure against jeopardy from the aggregate impacts of the program. This is why

the ESA's implementing regulations mandate programmatic consultation in addition to project-

level review. *See* 50 C.F.R. §§ 402.02, 402.14(c)(4); ECF No. 45 at 20-21.

     In contrast to this squarely applicable precedent, Defendants' reliance on *Center for

Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), is

9

misplaced. There, the court held that a claim that an oil lease sale program was required to undergo Section 7 consultation was *unripe*, both because the initial sale stage did not cause harm to listed species and because any activities that might cause harm to listed species would necessarily have to undergo Section 7 consultation at a later stage. *Id.* at 482-83, Indeed, in that case, it was not even certain that any listed species would be in the areas where the projects would ultimately take place. *Id.* at 483.

The circumstances here are dispositively different. First, as the Montana district court held with regard to the prior permutation of NWP 12, there is no assurance that pipeline projects affecting imperiled species will *ever* be subjected to consultation because the permit delegates the critical threshold decision on whether to initiate consultation on site-specific applications of the permit to self-interested project proponents. *See Northern Plains* at 993-94; ECF No. 45 at 22-24. Second, here the Corps has already acknowledged that listed species *will* be affected by thousands of activities authorized by NWP 12. NWP001046. Third, although the Court of Appeals stressed that in the initial leasing stage of the oil leasing process prospective purchasers acquired no rights to develop any of the areas, *id.* at 473, NWP 12 is not only a program, but also a *permit* that automatically authorizes construction activities so long as project proponents assert that they are complying with the terms of the permit. Consequently, Plaintiffs' contention that the Corps is required to consult on the permit *itself*—rather than site-specific applications that may or may not ever be subject to consultation—is surely ripe for review, as the Montana district court held in *Northern Plains* and this court held in *Brownlee*.[7]

---

[7] The 2009 *Center for Biological Diversity* case also predates the Services' 2015 and 2019 regulations defining and explaining the requirements for programmatic consultation, which clarified that programmatic consultation *is required* for such programs. *See* NWP019877 (The ESA "still requires a programmatic consultation" even if specific projects "are subject to site-specific . . . consultations").

Moreover, the Supreme Court's ruling on motions for stay pending appeal in the *Northern Plains* case undermine any notion that Plaintiffs' claim is unripe or that Plaintiffs are not entitled to judgment on the merits. When the Corps and intervenors here sought a stay of the *Northern Plains* ruling, the Supreme Court, while narrowing the injunctive relief, refused to stay either the declaratory judgment in Plaintiffs' favor or the court-ordered remand for Section 7 consultation on the version of NWP 12 then in effect. *See North Plains Res. Council*, 207 L. Ed. 2d at 1116; *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (holding that a party seeking a stay of a judgment must make a showing that it is likely to prevail on the merits). This effectively forecloses the Corps' contention that it may once again bypass consultation on the current version of the same nationwide permit.

## III.   The Corps Unlawfully Delegated the Initial Effects Determination to Permittees

The *Northern Plains* court also correctly held that the Corps, in issuing the prior version of NWP 12, unlawfully delegated the initial determination of whether a project affects listed species to the project proponent. *See Northern Plains* at 993-94 (citing 50 C.F.R. § 402.14(a)). By disregarding this ruling (which, again, was left undisturbed in both the Ninth Circuit and Supreme Court) and once again authorizing a self-interested permittee to determine whether its own project will affect listed species, the Corps failed to ensure that project-specific consultations will occur for *all* NWP 12-authorized activities that may adversely affect such species, as the ESA requires. *See* 16 U.S.C. § 1536(a)(2) (imposing the obligation on *agencies* to ensure that actions they permit do not jeopardize listed species or impair their critical habitats); 50 C.F.R. § 402.14(a) (federal agencies must review their actions at the earliest possible time to determine whether they "may affect" listed species).

The *Northern Plains* ruling is consistent with well-settled D.C. Circuit precedent. In *Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002), the Court of Appeals held that the

11

FWS could not delegate to a private party the agency's statutory responsibility under the ESA to determine whether impacts on a listed species had been mitigated "'to the maximum extent practicable.'" *Id.* at 184 (quoting 16 U.S.C. § 1539(a)(2)(B)). The court explained that "[w]hen a statute requires an agency to make a finding as a prerequisite to action, it must do so." *Id.* at 185. Thus, the Corps may not "delegate its responsibility to the regulated party." *Id.* (citing *State of Idaho v. ICC*, 35 F.3d 585, 596 (D.C. Cir. 1994)); *see also Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C. Cir. 1988) (holding that the agency "may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it"); *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 125 (D.D.C. 2012) ("The Court sees no reason to entrust the interest of endangered species to private ranchers, when Congress has already delegated that authority elsewhere.").

This court underscored that agencies may not delegate their ESA responsibilities to private parties in *Public Employees for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) ("*PEER*"). Relying on *Gerber v. Norton*, Judge Walton held that FWS had improperly delegated its statutory responsibility under Section 7 to set forth measures for mitigating impacts on listed species in a biological opinion. Because the agency had rejected measures based solely on the position of the private applicant and another federal agency, *id.* at 108-09, the court held that "this is not acceptable" because the ESA required FWS itself to make an independent determination. *Id.*

The same result must be reached here. If anything, the Corps' delegation to private parties is even more egregious than in *Gerber* or *PEER* because those cases concerned the FWS's reliance on the regulated party *as part of* the ESA review process regarding whether impacts were being sufficiently minimized and mitigated. Here, the Corps has delegated to the

private permittee the *threshold* determination regarding whether a federally permitted action even requires consultation in the first instance. If the self-interested permittee fails to notify the Corps for any reason—such as a failure adequately to investigate or a desire to proceed rapidly—there will be no ESA consultation process whatsoever, and thus no opportunity to even consider, let alone apply, measures necessary to avoid, minimize, and/or mitigate adverse effects. That is why the ESA expressly requires that the *Corps*, as the action agency subject to the ESA Section 7 requirement, "insure" that private actions it permits will not jeopardize imperiled species and, in turn, make the initial effects determination that triggers the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The delegation to permittees to make that crucial determination is therefore a clear violation of the ESA under D.C. Circuit precedent.

## IV.    The Corps' Environmental Assessment for NWP 12 Violated NEPA

The Corps' EA was prepared under 40 C.F.R. § 1508.1(g) (2020), pursuant to which the agency must consider not only direct effects, but those "that are later in time or farther removed in distance" and that are "reasonably foreseeable."[8] The Corps' NEPA regulations further required it to analyze "direct, indirect and cumulative impacts . . . within the purview of the NEPA statute." 33 C.F.R. pt. 325, App. B, § 7(b)(3). Consideration of these impacts is required to meet the "hard look" standard, which comes from the NEPA statute itself. *See* 42 U.S.C. § 433(2)(C) (requiring an evaluation of "any environmental effect . . . to the fullest extent possible"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (describing relation of hard look standard and statute). As explained, the Corps' EA fails to take the requisite "hard look."

---

[8] On April 20, 2022, the CEQ issued new NEPA regulation amendments that generally restored the provisions that were in effect for decades before being modified in 2020. 87 Fed. Reg. 23453 (April 20, 2022).

A. **The Corps violated NEPA by failing to analyze the risks and consequences of oil and gas leaks and spills**

The Corps' duty under NEPA to consider the risks and impacts of oil spills from pipelines is well-established in the D.C. Circuit. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 131 (D.D.C. 2017), *aff'd*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022). Indeed, in *Standing Rock*, the court specifically held that the Corps violated NEPA because it failed to adequately analyze the risks and consequences of oil spills. 255 F. Supp. 3d at 112. The court emphasized that even though an oil spill was not certain to occur, "the Corps still had to consider the impacts of such an event on the environment." *Id.* at 132. The court held that though "the Corps did not wholly ignore the consequences of a possible oil spill," the Corps "did not adequately address oil spill impacts on fishing rights, hunting rights, or environmental justice, or the degree to which the pipeline's effects are likely to be highly controversial." *Id.* at 147.

In affirming that decision, the D.C. Circuit agreed that the pipeline's effects, including oil spills, were highly controversial and found that the Corps did not adequately analyze the risk of oil spills in its EA. *See Standing Rock Sioux Tribe*, 985 F.3d at 1039, 1050. It further held that "although the risk of a pipeline leak may be low, that risk is sufficient 'that a person of ordinary prudence would take it into account in reaching a decision' to approve the pipeline's placement, and its potential consequences are therefore properly considered here." *Id.* (citation omitted).

Likewise, in *Red Lake Band of Chippewa Indians*, this Court also recognized the Corps' duty to analyze oil spills. *See Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*, 2021 WL 430054, at *9 (D.D.C. Feb. 7, 2021). Though the Court stated that it would not decide "whether the Corps must categorically consider effects of oil spills," *id.* n.6, the Court

14

analyzed whether the Corps "took a 'hard look' at the risk and effects of oil spills," and concluded that "the Corps adequately considered the effects of a potential oil spill *to discharge its duties under NEPA* and the CWA," thereby confirming the basic premise that the Corps must conduct such an analysis. *Id.* (emphasis added).

And the Court's decision in *Red Lake* confirms that the Corps failed to adequately assess oil spill risks and effects in its EA for NWP 12. There, the Court found that the Corps took a sufficiently 'hard look' at the consequences of potential oil spills when it "review[ed] the modeling of hypothetical worst-case discharge spill scenarios," "discuss[ed] the effects of an oil spill on aquatic life, birds, mammals, and wildlife," and "examin[ed] spill prevention, detection, and response measures." *See* 2021 WL 430054 at *10. The Corps engaged in no such analysis here. Unlike the *Red Lake* EA, which "devote[d] several pages to discussing [the pipeline's] 'reliability and safety'" as relevant to oil spills, 2021 WL 430054 at *9, the discussion of oil spills in the NWP 12 EA consisted of just a few single-sentence acknowledgements that oil spills may result from NWP 12-authorized pipelines. *See e.g.,* NWP001034 ("During the operation of oil or natural gas pipelines, the oil, natural gas, or petrochemical substances carried by those pipelines may leak into surrounding areas."); NWP001041 ("Pollutants may also be discharged through spills and other accidents."). This is clearly insufficient to meet the requirements of NEPA. *See N.Y. v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012) ("[A]n agency conducting an EA generally must examine both the probability of a given harm occurring *and* the consequences of that harm if it does occur.") (emphasis in original).

Indeed, the Corps' omission of any analysis of the environmental impacts of oil spills was explicit in the EA, as the Corps argued that it is "not required to perform a detailed analysis of the effects of those possible future leaks or spills" because it "does not have the authority to

take actions to prevent or control potential leaks or spills that may occur." NWP000952. This directly conflicts with *Standing Rock*'s mandate that the Corps evaluate the environmental effects of both "(1) the construction of the pipeline, *and* (2) an unanticipated oil spill." *See Standing Rock*, 255 F. Supp. 3d at 131 (emphasis added).

Because Plaintiffs' claims are limited to leaks and spills into the water crossings and wetlands authorized by NWP 12, this case is distinguishable from *Sierra Club,* 803 F.3d at 46-48, which involved impacts to upland areas that the court found to be outside of the Corps' jurisdiction. This is also not a case where the agency has "no ability to prevent a certain effect due to that agency's limited statutory authority over the relevant action," like FERC's lack of authority over the decision whether to export natural gas in *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016). Here, the Corps has the authority to prevent leaks and spills into the waters by not issuing NWP 12 under CWA 404(e), 33 U.S.C. §1344(e)(1), by excluding oil and gas pipelines from this nationwide permit, or by minimizing the risk and impact by regulating the size, number, or location of the water crossings. *See Sierra Club v. FERC*, 867 F.3d 1357, 1372-73 (D.C. Cir. 2017) (distinguishing *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 766-770 (2004) because the agency had the authority to deny the permit at issue), *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867 (9th Cir. 2005) ("Because a 'reasonably close causal relationship' exists between the Corps' issuance of the [§404] permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills, the Corps had a duty to explore this relationship further in an EIS.") (quoting *Public Citizen*, 541 U.S. at 754).

Furthermore, it does not matter whether oil and gas pipelines are regulated by other federal agencies. *See Sierra Club*, 867 F.3d at 1375, *citing Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1122–23 (D.C. Cir. 1971). And because

this case is limited to the impacts of oil and gas spills and leaks *into* the water crossings authorized by NWP 12, the cases addressing more attenuated "downstream" impacts are distinguishable. *See, e.g.*, *Red Lake Band of Chippewa Indians*, --- F.Supp.3d ---, 2022 WL 5434208 at *12 (greenhouse gas combustion impacts and climate change), citing *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1294 (11th Cir. 2019) (distant mine waste disposal).

### B.  The Corps' EA fails to adequately analyze frac-outs, forested wetlands, and cumulative impacts

NEPA requires agencies to take a "hard look" at "'every significant aspect of the environmental impact'" of a proposed major federal action. *See Pub. Employees for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1083 (D.C. Cir. 2016) (quoting *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97 (1983)). In this case, the Corps violated this standard regarding several impacts of NWP 12. For starters, the Corps failed to analyze "Frac-outs" – the inadvertent returns of drilling fluids into Corps' jurisdictional waters that may occur during hydrologic directional drilling (HDD). *See* ECF No. 45 at 34-37; ECF No. 78 at 32-35. Although the Corps' EA acknowledged the impacts of frac-outs in one sentence, NWP001035, it did not address the frequency, risks, or impacts that drilling fluids can have on waterways, despite ample record evidence. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("simple, conclusory statements of no impact are not enough to fulfill an agency's duty under NEPA."); ECF No. 45 at 35-36.

The Corps refused to analyze these impacts because it claimed it "does not have jurisdiction" over them. NWP001035. And in its response brief, the Corps asserted yet a new rationale for ignoring this impact: that it does not "authorize" HDD under NWP 12. Not so. NWP 12 does, in fact, cover HDD and associated impacts. The Corps' EA itself even

17

acknowledges that NWP 12 may "authorize oil or natural gas pipelines in or affecting navigable waters of the United States even if there is no associated discharge of dredged or fill material" in part because it authorizes "work necessary for the remediation of inadvertent returns of drilling fluids" during HDD activities. NWP000946. Moreover, the EA states that to comply with NWP 12, "the permittee must submit a pre-construction notification (PCN) to the district engineer prior to commencing the activity if [] a section 10 permit is required." NWP000947. The Corps issues section 10 permits under 33 U.S.C. §403, 33 C.F.R. §320.2(b), and thereby regulates HDD. Because section 10 and NWP 12 are interrelated, the Corps was required to analyze these impacts.

On the forested wetlands issue, while this court previously upheld the Corps' determination—for a 2007 NWP 12 project—that converting such wetlands does not create permanent adverse effects, *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F. Supp. 2d 32, 45-46 (D.D.C. 2013), the instant case is distinguishable as it is a challenge to the programmatic EA for the 2021 NWP 12 and therefore implicates impacts from thousands of uses of NWP 12 across the country rather than from a single project. Here, the record shows the Corps did not consider which wetlands functions may be lost, at what levels, and in which regions or ecosystems from the NWP 12 program, clearly violating NEPA's "hard look" mandate. *See* ECF No. 45 at 38; ECF No. 78 at 36.

The Corps also failed to take a hard look at the effects that can occur from multiple pipeline crossings in close proximity to one another, even though the record contains ample evidence of such impacts. *See* ECF No. 45 at 39; ECF No. 78 at 37. That is clearly a violation of NEPA's "hard look" requirement. *See Am. Rivers v. FERC*, 895 F.3d 32, 49, 51 (D.C. Cir. 2018) (finding the agency failed to analyze cumulative impacts on water quality and that

"courts . . . cannot evaluate the reasonableness of the unexplained.").

## V.   NWP 12 Violates CWA Section 404(e)

NWP 12 does not comply with CWA §404(e)(1), 33 U.S.C. § 1344(e)(1), for two reasons. First, the Corps relied on project-level review for its determination that the activities covered by §404(e) will have only "minimal" effects, even though the Corps may not conduct that review for thousands of NWP 12 activities. *See* ECF No. 45 at 49-55; ECF 78 at 51-55. Second, the Corps applies a definition of "single and complete project" that allows it to authorize projects with an *unlimited* level of impacts, rather than limiting its applicability to activities with only "minimal" impacts. *Id.*

While this court acknowledged that the 2007 NWP 12 definition of "single and complete project" may apply as long as the crossings are "separate and distant," *Ouachita Riverkeeper*, 938 F.Supp.2d at 37, the record in this case shows that the Corps' use of that definition is inconsistent with 404(e). Indeed, Plaintiffs provided a wealth of evidence of clustered crossings and impacts from supposedly separate and distant crossings, which the Corps failed and refused to address. ECF No. 45 at 52-55; ECF No. 78 at 52-53. This renders the Corps' decision arbitrary and capricious. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022) (an agency "may not reach a conclusion that 'runs counter to the evidence.'") (citation omitted).

## VI.   Remedy

In the D.C. Circuit, as in the Ninth Circuit, when a court concludes that agency action is unlawful, "the practice of the court is ordinarily to vacate the rule." *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA.").

Although vacatur is the normal remedy, courts sometimes decline to vacate an agency's action depending on the "seriousness of the order's deficiencies" and the "disruptive consequences of an interim change." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). As explained, here Defendants have not shown that the disruptive effects weigh against the presumptive remedy of vacatur. ECF No. 78 at 60-63. Nor could they, given the availability of individual permits for pipeline construction. Regardless, the nature of the Court's summary judgment ruling will have a significant bearing on the appropriate relief. Therefore, given the circumstances, Plaintiffs believe it would be appropriate to allow for further factual development and legal briefing before determining the appropriate remedy. *See id.* at 60.

## CONCLUSION

For the foregoing reasons and those set forth in their summary judgment briefing, Plaintiffs respectfully request that the Court grant their motion for summary judgment, declare that the Corps is in violation of the ESA, NEPA, CWA and APA, and vacate and remand NWP 12.

Respectfully submitted this 18th day of November 2022.

/s/ Eric Glitzenstein
Eric Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(202) 849-8401

/s/ Jared Margolis
Jared Margolis (admitted pro hac vice)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org
eglitzenstein@biologicaldiversity.org

*Attorneys for Center for Biological Diversity, Friends of the Earth, and Waterkeeper*

<u>/s/ Eric Huber</u>
Eric Huber (admitted pro hac vice)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
Eric.huber@sierraclub.org
*Attorney for Sierra Club and Montana Environmental Information Center*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.

/s/ Jared Margolis